THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JAMES LEROY CHILDERS, Defendant-Appellant.

Third District    No. 79-161

Opinion filed March 18, 1981.—Rehearing denied April 22, 1981.

Joseph R. Napoli and Arthur J. Inman, both of Peoria, for appellant.

Bruce W. Black, State's Attorney, of Pekin (John X. Breslin and Gerry R. Arnold, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE WEBBER delivered the opinion of the court:

Defendant, a 17-year-old youth at the time of the offense, was found guilty of murder by a jury in the circuit court of Tazewell County in violation of section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1). The victims were his stepfather, his mother, and his younger brother. He was sentenced to three concurrent terms of imprisonment for his natural life.

On appeal defendant raises a number of issues for our consideration. These may be grouped into the following headings: (1) discovery, (2) suppression of confession, (3) trial mechanics, (4) reasonable doubt as to sanity and (5) excessive sentence.

The principal evidence at trial consisted of defendant's confession. This revealed that he arrived home at about 1 a.m. on July 9, 1978, and after a quarrel with his stepfather and his mother he killed them by means of a handgun and a knife. He followed these homicides by killing his younger brother by stabbing him when he was apparently attempting to escape from the house. Defendant then ransacked the house in an attempt to create the appearance of a robbery and multiple homicides. He placed the weapon and knife he had used, money he had taken from the wallets of his parents, and the clothing he was wearing in a paper sack. He cleaned himself up, changed clothing and departed the premises, driving toward Peoria from the home in Pekin. On the way he threw the paper sack into the river from a bridge. Neither the sack nor its contents were ever recovered.

Defendant proceeded to his fiancée's home where he threw his house key to his own home into the yard. It was subsequently recovered. He let himself into his fiancée's home and attempted to sleep but was unable to do so.

Other evidence, *aliunde* the confession, revealed that at about 3 a.m. he called the police station and told the police, after identifying himself, that he had been unable to gain entry into his home at Pekin and asked that someone be sent there to investigate. He left the telephone number at which he could be reached. The police responded and discovered the bodies of the victims shortly afterwards.

The officer in charge of the investigation called the number which defendant had left with the police and asked him to come to the station house. He complied, arriving about 5:30 a.m. with his fiancée and her mother. He was wearing blue jeans and a red shirt. The officer informed defendant of what had been discovered at his Pekin home, whereupon he became very overcome emotionally. The officer then conducted an interview with the defendant. It was of a very general nature as to the family, who their friends were, what he knew about them and when he had last seen them. Defendant stated that he had remained with his fiancée during the evening hours up to about 1 a.m. at which time he had returned home but was unable to gain entry because he did not have his house key. He asserted that he had given it to his younger brother who had not returned it. He then asked how long he would be required to remain at the station house. The officer testified that he informed defendant that he would not be required to stay but that the police would appreciate his staying in order for them to obtain further information

about the family. He further testified that defendant stated that he would stay as long as necessary, and that he would cooperate and help in any way he could.

The officer further testified that after the initial interview defendant's fingerprints and palmprints were taken for comparison purposes. According to the officer, defendant approached him a short time thereafter and stated that he had forgotten to tell the police that he had changed clothing earlier in the evening before going home, and that he had placed this clothing between the front doors of the house. No such clothing was ever found. Shortly after this, defendant consented to a search of his car and of his person (fingernail scrapings and footprints). The consent on the car was obtained about 9 a.m. and consent for the person about 10:45 a.m. The officer testified that these searches were also for comparison purposes.

Meanwhile, the police had interviewed a neighbor to the Pekin home. He stated that he had been awakened at about 1 a.m. by muffled sounds, banging, screams and yelling, coming from the Pekin house. He further told the police that he saw all the lights in the house come on and then go off except for a small hall light, and that he saw a person in red clothing in the back bedroom window. Then, he stated, one of three cars in the driveway left being driven by someone he could not see. The officer in charge of the investigation first had the opportunity to review the neighbor's statement sometime between noon and 1 p.m.

Sometime between 3:30 and 4 p.m. the officer confronted defendant with the neighbor's statement. Defendant became somewhat emotional and stated that he wanted to tell the truth. He was given the *Miranda* warnings and then made a statement to the police which can be summarized as follows: He went to the house and entered using his own key; he found the bodies of his brother, stepfather, and mother; he picked up the gun which he found lying near his brother's body and carried it around the house; during his tour of the house he became covered with blood and changed his clothing; he became frightened and left the house taking the bloody clothing and gun with him; he threw the clothing and gun into the river from the bridge while driving toward Peoria; he denied having anything to do with the killings.

Following this second statement, the officer told defendant that he did not believe him. Defendant then asked to talk to his fiancée and this was permitted. He then made a third, or final statement, commencing at 5:37 p.m. and concluding at 5:58 p.m. The *Miranda* warnings were reiterated, and the third statement was the confession, the substance of which has been set forth above. At the conclusion of the statement defendant was arrested on charges of murder.

Prior to trial defendant filed motions for the appointment of a

psychiatrist and for the suppression of his confession. He testified at the suppression hearing that he had been held at the police station for about 12 hours, and had had no sleep the night before. He claimed that he asked to be released about three to five times but received equivocal responses from the officers, *e.g.*, "In a minute," "As soon as this was over," "In a few minutes." He also claimed that he was suffering severe stomach cramps and was given a patent-medicine remedy but no other medical attention; that at first he was permitted to roam at large by himself but soon after the first statement an auxiliary guard followed him everywhere. He further averred that at one point he asked for a lawyer and that he had a discussion with the officer in charge about a possible manslaughter charge. After the manslaughter discussion, he said that he had changed his mind about seeing a lawyer. He was permitted freely to speak with his fiancée at various times during the day.

Other witnesses at the suppression hearing on behalf of the defendant, his fiancée, the fiancée's mother and defendant's aunt, all testified along the same lines, *i.e.*, that defendant appeared pale and ill, that they were told that he might be able to leave "in a few minutes" but that they were free to leave at any time.

The State's witnesses at the suppression hearing, two officers who had been involved in the investigation, testified that defendant had asked for an attorney between the second and third statements and then said that he had changed his mind and did not want one. They denied using the term "manslaughter" but indicated that the words "self-defense" and "heat of passion" were used in the conversation. One officer stated that the defendant asked at the conclusion of the third statement whether he might be charged with manslaughter, but noted that in the third statement defendant had said that no promises had been made to him in return for the statement.

At the conclusion of the hearing the trial court denied the motion to suppress which covered both the second and third statements.

At trial defendant presented an insanity defense and called only two witnesses, both psychiatrists. One stated that defendant suffered from an "acute depressive reaction" and at the time of the offense lacked substantial capacity to appreciate the nature of his conduct and the criminality involved. The second doctor reached similar conclusions and diagnosed defendant as having a psychoneurotic depressive reaction. He stated that even if a policeman had been present at the time, it would have been impossible for defendant to conform his conduct to the requirements of the law.

In rebuttal, the State presented three experts. All of them stated that defendant was capable of conforming his conduct and appreciating the criminality of his actions. One of the State's experts was Dr. Philipp

Bornstein, a psychiatrist, who stated that defendant suffered from unipolar depression, a term which indicated that defendant was depressed at all times. It is over Dr. Bornstein's testimony that much of the controversy in the instant case exists.

Following the jury's verdicts of guilty, the trial court denied defendant's motion for new trial and sentenced him as above described.

The discovery issues arose out of events which occurred shortly after arraignment. The public defender was appointed to the defendant and he moved immediately for the authorization of a psychiatrist under section 113—3(d) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 113—3(d)). The trial court authorized the employment but did not limit the cost to the $250 specified in the statute. Rather, the trial court authorized reasonable fees. The record is obscure as to which of the expert witnesses were paid at county expense, but it is clear that Dr. Bornstein was so paid.

Private counsel entered his appearance later and gave notice of an insanity defense in accordance with Supreme Court Rule 413(d) (Ill. Rev. Stat. 1979, ch. 110A, par. 413(d)). In accordance with the same rule, defendant supplied a list of his witnesses and Dr. Bornstein was not among them. The State moved for disclosure under Supreme Court Rule 413(c) (Ill. Rev. Stat. 1979, ch. 110A, par. 413(c)) of Dr. Bornstein's report of his examination of defendant. Defense counsel vigorously opposed the motion, but it was allowed by the trial court and the State ultimately called Dr. Bornstein as one of its witnesses as above described.

Defendant contends on appeal that the trial court's order directing disclosure of the Bornstein report was beyond the scope of Rule 413(c), that the psychiatrist's conclusion that defendant was not insane within the meaning of the statute, when revealed in this manner, was a violation of his fifth amendment privilege, and that the exposure of the report violated the physician-patient privilege. We disagree.

Defendant relies in large measure on *People ex rel. Bowman v. Woodward* (1976), 63 Ill. 2d 382, 349 N.E.2d 57. In that case the supreme court agreed with the defendant that the broad discovery sought was a violation of the constitutional assurances against self-incrimination. It is noteworthy that in *Woodward* the State attempted to determine the existence of any tests, experiments or reports, and then to have them produced. No such fishing expedition exists in the instant case. The request to produce was specific, *viz.*, the Bornstein report, which was known by the State to exist since it had been prepared at the expense of the county under section 113—3(d) of the Code. *Woodward* is inapposite.

Furthermore, if the trial court had denied the motion to produce, the State could have obtained the same information by means of section 115—6 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38,

par. 115—6). That section provides in substance that if notice has been given of an insanity defense, the State may move for an involuntary psychiatric examination by an expert to be named by it. While the trial court's compliance with section 113—3(d) is less than complete, it is apparent that it was proceeding under that section and no other. We can find no basis for making a distinction between treatment of the matter under section 113—3(d) and section 115—6. Defendant has cited no authority which would give him greater protection under the former.

Nor do we find that the report, while adverse to defendant, denied him any privilege against self-incrimination. The sole issue at trial was defendant's sanity. By his confession he had admitted the acts; therefore, the report could bear only on his mental state. In *People v. Williams* (1967), 38 Ill. 2d 115, 230 N.E.2d 224, there was an involuntary examination of the defendant in connection with a competency hearing. The supreme court concluded that since the statements and reports went to the issue of mental condition rather than the truth of the matters which they contained, there was no fifth amendment violation. We find the instant case parallel. ■■ The trial court's order for disclosure was not in error.

The next general proposition to be discussed is defendant's confession, the third or final statement made to the police, together with the second statement which was contradictory. Defendant argues two principal points: (1) That the totality of the circumstances indicate that the statements were involuntary, and (2) that insufficient time had elapsed from his demand for an attorney to permit a waiver.

The general rule is that the voluntary nature of a confession is to be tested by the totality of the circumstances surrounding its making rather than by any one individual factor. (*In re Lamb* (1975), 61 Ill. 2d 383, 336 N.E.2d 753.) The sequence of events has been recited above and need not be repeated here. Defendant stresses that he was only 17 years old with no prior involvement with law enforcement authorities; that he was emotionally overcome at the death of his family; that he was ill during at least part of the interrogations; that he had had no sleep since 7 a.m. the morning before; that the officers talked about self-defense and heat of passion; and that he had been continuously detained since about 5 a.m. in the morning until the third statement at about 5 p.m. in the afternoon.

When viewing the events which occurred at the station house, it must be borne in mind that all of these were initiated by the defendant himself, and deceitfully so. He knew at the time of the initial telephone call exactly what had happened at the Pekin home and from then on until the early afternoon attempted to mislead the police. His efforts at obfuscation, and when these failed, his further efforts to reduce the heinous nature of the offense, fall far short of demonstrating a complete naivete. His emotion-

alism, which appeared to have an intermittent quality, is suspect. Stomach cramps would seem a normal syndrome under the circumstances.

■■ The trial court was in a far superior position to judge these matters, and we cannot say that its findings were against the manifest weight of the evidence. *People v. Spataro* (1978), 67 Ill. App. 3d 69, 384 N.E.2d 553.

As to the question of time lapse affecting the demand for an attorney, the record clearly indicates that it was almost immediately withdrawn. In *People v. Young* (1978), 60 Ill. App. 3d 351, 376 N.E.2d 739, the defendant first asked for an attorney and then 30 seconds to one minute later elected to speak without further reference to an attorney. The court held that the statement was properly admitted. The supreme court said:

> "An initial request for counsel is not irreversible, absent a showing that the expressed desire to make a statement without the presence of counsel was made under the force of continued impermissible interrogation." *People v. Morgan* (1977), 67 Ill. 2d 1, 5-6, 364 N.E.2d 56, 58.

■■ Although defendant argues that the instant case is factually akin to *People v. Savory* (1980), 82 Ill. App. 3d 767, 403 N.E.2d 118, we do not agree. It is clear that in *Savory* the officers continued their interrogation and convinced the defendant to talk despite his attempted exercise of his *Miranda* rights.

One final comment is in order on the subject of the defendant's confession. The matter is alluded to indirectly in the briefs of the parties, but not emphasized. It is the matter of detention at the station house without probable cause for arrest. In *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, the Supreme Court held that detention without probable cause for a long period of time intruded so severely on the fourth amendment rights of the defendant as to trigger the safeguards of illegal arrest. We are aware of the prior decisions in *People v. Dowdell* (1980), 81 Ill. App. 3d 266, 401 N.E.2d 295, and *People v. McMahon* (1980), 83 Ill. App. 3d 137, 403 N.E.2d 781, as well as the recent decision in *People v. Townes* (1981), 94 Ill. App. 3d 850, all of which followed *Dunaway* and held statements procured under those circumstances inadmissible.

■■ The instant case is quite unlike those just referred to. Here the defendant volunteered himself into the station house and deceitfully bent every effort to mislead the police. There is no indication in the record that the police were doing anything other than attempting to protect the defendant until the officer shortly after noontime had the opportunity to review the statement of the neighbor. It was then that defendant's duplicity began to emerge and adequate probable cause to detain him arose. It would create a mockery of constitutional protections to say that a

defendant could wilfully and fraudulently engender what superficially appears to be a *Dunaway* situation and then take advantage of it.

No error occurred in the trial court's denial of the motion to suppress.

Defendant next raises two issues regarding the mechanics of trial: (1) The denial by the trial court of his application for the divestiture of a news reporter's privilege, and (2) the denial by the trial court of his motion to excuse a juror.

The first matter arose out of an article appearing in a Peoria newspaper which stated that the defendant had confessed after being interrogated for 14 consecutive hours. Defendant sought disclosure of the reporter's source under section 3 of "An Act concerning disclosure of the sources of information obtained by certain persons in the news media" (Ill. Rev. Stat. 1979, ch. 51, par. 113). After a hearing, the trial court denied the application.

■■ There appear to be no cases in this State construing the Act, which is admittedly of recent origin. Section 7 of the Act (Ill. Rev. Stat. 1979, ch. 51, par. 117) provides, in part, that the divestiture order shall be granted only if the court finds that all other available sources of information have been exhausted and that the disclosure of the information sought is essential to the protection of the public interests involved. The record discloses that this test was not met. Defense counsel admitted that he had not inquired of the officers conducting the interrogation how long it had lasted, nor had he inquired of other officers at the station house. Defendant himself never maintained that he had been interrogated, continuously or continually, for 14 hours. Neither did his fiancée, nor the fiancée's mother, both of whom were at the station house all day. Other sources not only were available to defendant, but it is difficult to perceive what public interest might be involved. (Compare *Baker v. F & F Investment* (2d Dist. 1972), 470 F.2d 778.) No error occurred in the denial of the application.

The incident concerning the juror occurred on the second full day of trial following the impaneling of the jury. One of the jurors communicated to the trial judge that he was an auxiliary policeman with the city of Morton. However, it was not a salaried position and was principally concerned with crowd control during public events. The juror stated that no questions had been asked of him during *voir dire* as to his possible connection with law enforcement and he did not volunteer such information. Following the receipt of these facts, the trial court promptly informed counsel, and defense counsel moved to dismiss that juror and replace him with an alternate. The motion was denied.

The trial judge made a lengthy statement into the record concerning his conversation with the juror. In it he stated that the juror indicated to him that he could be fair to both sides and that his position as an auxiliary

would not affect his judgment. The judge stated that he did not believe that a juror had any affirmative duty to disclose information not asked for on *voir dire* and further that the principal question on trial would be insanity, on which question the judgment of an auxiliary would not be subject to influence any more than anyone else.

■■ In *People v. Harris* (1979), 74 Ill. 2d 472, 386 N.E.2d 60, the court was confronted with a situation where a juror had answered falsely on *voir dire*. Even in that situation, the supreme court held that a motion for new trial based on such false answers would not be allowed unless prejudice could be shown and that the matter lies within the sound discretion of the trial court. Defendant here has failed to demonstrate any prejudice, especially since no false answers were involved. The trial court's ruling was correct.

Defendant next contends that the State failed to prove beyond a reasonable doubt that he was sane at the time of the offense. Undoubtedly this is the State's burden. (*People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6.) However, the determination of sanity by the trier of facts will not be disturbed "unless it is so palpably erroneous as to indicate that it was based on prejudice or passion." *People v. Kuhn* (1979), 68 Ill. App. 3d 59, 63-64, 385 N.E.2d 388.

■■ In the instant case, the jury heard extensive expert testimony from psychiatrists and psychologists. Without extensive review of the testimony it is clear that the expert witnesses differed greatly in their analysis of the defendant. Two expert witnesses testified that the defendant could not conform his conduct to the requirements of the law at the time of the offense, while three expert witnesses concluded that the defendant could have conformed his conduct to the requirements of the law. Clearly the expert testimony is conflicting, and when such evidence is conflicting it is within the jury's province to believe some experts over others. (*People v. Piche* (1976), 44 Ill. App. 3d 993, 358 N.E.2d 1260.) It does not appear that the jury's determination can be categorized as so palpably erroneous as to indicate that it was based upon prejudice or passion.

Defendant's final contentions relate to sentencing. He first claims that the statute permitting natural life imprisonment, section 5—8—1(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1)), is unconstitutional. This contention is answered in *People v. Nobles* (1980), 83 Ill. App. 3d 711, 404 N.E.2d 330. The statute is constitutional.

■■ Defendant next contends that it was error to impose the sentences in his case. We disagree. There was testimony at the sentencing hearing which indicated that the nature of the crime was brutal and that the defendant had experienced prior behavioral problems. The evidence from the pathologist indicating the number of times the victims were

stabbed, shot, and mutilated, alone would indicate brutal and heinous behavior. The trial court's judgment in this respect will not be disturbed.

The defendant's conviction and sentence are affirmed.

Affirmed.

MILLS and GREEN, JJ., concur.