THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* KENNETH GHOLSTON *et al.*, Defendants-Appellants (Jerry Cummings *et al.*, Defendants).

First District (2nd Division) Nos. 82—248, 82—249, 82—278, 82—287, 82—3144 cons.

Opinion filed June 5, 1984.

876

James J. Doherty, Public Defender, and T. Lee Boyd, Jr., of Boyd & Boyd, both of Chicago (Judith A. Stewart, Assistant Public Defender, of counsel), for appellants.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Kevin Sweeney, and David A. Cuomo, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DOWNING delivered the opinion of the court:

A grand jury charged nine defendants with rape (Ill. Rev. Stat.

1979, ch. 38, par. 11—1), deviate sexual assault (Ill. Rev. Stat. 1979, ch. 38, par. 11—3), two counts of indecent liberties with a child (Ill. Rev. Stat. 1979, ch. 38, pars. 11—4(a)(1), (2)), two counts of robbery (Ill. Rev. Stat. 1979, ch. 38, par. 18—1), five counts of aggravated battery (Ill. Rev. Stat. 1979, ch. 38, pars. 12—4(a), (b)(9)), and two counts of conspiracy to commit robbery (Ill. Rev. Stat. 1979, ch. 38, par. 8—2).

The following defendants appeal from their convictions and indicated sentences: Kenneth Gholston, after a separate jury trial, was found guilty of rape, deviate sexual assault, one count of indecent liberties with a child, two counts of robbery, three counts of aggravated battery, and one count of conspiracy to commit robbery. The sentence imposed was an aggregate term of 258 years' imprisonment. David Love, after a bench trial, was found guilty as charged and sentenced to an aggregate term of imprisonment, the exact length of which is not clear from the record. Danny Gholston, after a separate jury trial, was found guilty of rape, deviate sexual assault, one count of indecent liberties with a child, two counts of robbery, three counts of aggravated battery, and one count of conspiracy to commit robbery. The sentence imposed was a concurrent term of 50 years' imprisonment. Dennis King, after a bench trial, was found guilty as charged and sentenced to a concurrent term of 30 years' imprisonment. Anthony Gholston, after a bench trial, was found guilty as charged and sentenced to a concurrent term of 25 years' imprisonment.

Six grounds for reversal are presented for our review: (1) that the trial court improperly denied defendants King, Love and Danny Gholston's motions to quash their arrests; (2) that the trial court improperly denied defendant Anthony Gholston's motion to suppress inculpatory oral and written statements; (3) that it was constitutionally impermissible for the trial court to order two jury trials and four bench trials to be conducted in a single proceeding; (4) that certain evidentiary rulings made by the trial court resulted in prejudicial error; (5) that defendant Love was not proved guilty beyond a reasonable doubt; and (6) that the trial court abused its discretion in determining defendants' sentences.

On December 27, 1980, at approximately 11:40 p.m., complainants Richard Fink (Fink), Matthew Kennedy (Kennedy) and a 15-year-old girl (victim) were traveling in the city of Chicago on the northbound "el" after having boarded the train at the Fullerton Avenue station. Although their destination was Evanston, the three youths got off the train at the Thorndale station because Kennedy was feeling ill. After a short while, the three moved to the north end of the "el" platform where they waited for the next train. While the youths listened to

music playing on Kennedy's radio, they were approached by a group of four or five males. Following several minutes of conversation, one of the males, later identified as defendant Joseph Thurmond, became very angry, grabbed the radio which was being held by Fink, and threw it down onto the tracks. Upon retrieving the radio, Kennedy was grabbed by one of the males and pinned against a sign on the platform. As Kennedy proceeded to fight with one of his assailants, later identified as defendant Danny Gholston, Kennedy's coat was pulled over his head, his gloves were taken and his wallet, containing $25, was removed from his rear pocket. Kennedy was then ordered to "drop [his] pants and shut up."

At approximately that same time, Fink was surrounded by three males, two of which were later identified as defendants Jerry Cummings and Anthony Gholston. Fink was thereupon held while he was beaten on the head and face, and kicked in the legs. Four or five dollars and some bracelets were taken from his person. Kennedy was also beaten on the head and face at this time; however, he and Fink managed to eventually break free and run down the stairs of the "el" platform where they telephoned the police.

At some point during the altercation, another group of three or four males ran toward the victim, surrounded her and began to feel her breasts through her winter jacket. Two of these assailants were later identified as defendants Kenneth Gholston and Dennis King. While crying and trying in futility to keep her tights and underwear from being pulled off, the victim was eventually pushed down onto the platform.

Defendant Kenneth Gholston was the first to rape the 15-year-old girl while other males stood around them yelling "Let me get in there, let me have some ***"; "spread them wider *** if you're not good we'll kill you." As several of the males fondled the victim's breasts through the jacket which they were unable to pull off of her, Kenneth Gholston told them that she was "good" and that they should take her home and put her "on the stroll." At some point thereafter, Kenneth Gholston lifted the victim up by her hips and attempted anal intercourse. He then stood up and allowed one of his companions, later identified as defendant Darrell King, to rape the girl.

While Darrell[1] King was having intercourse with the victim, he put his hand around her throat, choked her and told her to shut up. At this point, defendant Anthony Gholston crouched down near the

---

[1]The record and briefs before this court also refer to this particular defendant's first name as "Darryl" and "Darrel."

victim's face and forcibly inserted his penis into her mouth. As the young girl cried, the other assailants continued to yell "Let me get in." When Darrell King and Anthony Gholston were finished sexually gratifying themselves, defendant Dennis King proceeded to get on top of the victim and choke her as he inserted his penis into her vagina.

While Dennis King raped the victim, defendant Danny Gholston crouched down near her face and forcibly inserted his penis into her mouth. Soon thereafter, Danny Gholston yelled at Dennis King to "Let me get in there"; King then stood up to allow Danny Gholston to get into a position to rape the victim. The next thing the victim remembered was that David Love exchanged places with Danny Gholston and stated that "he was going to get his."

As a southbound train approached the Thorndale station, the victim was picked up and thrown down onto the tracks. Defendant Love then jumped off the platform, pulled the girl into the snow nearby and raped her. When Love was finished, the victim begged him not to kill or hurt her; however, before he stood up, Love hit the girl in the face very hard. Thereafter, the victim heard nothing but the sound of a train departing from the Thorndale station.

It was at this point that the victim observed a lot of blood and mucus around her vaginal area. She then began to crawl back toward the tracks. Reaching the platform, she proceeded along in the snow to a point where she could push herself up onto the surface of the platform. A gentleman standing nearby saw her, removed his jacket and put it around her shoulders. After a northbound train pulled into the station, the victim explained to the engineer what had happened. An order was then immediately dispatched from the train to stop the last southbound "el" that had left the Thorndale station. Soon thereafter, Fink met the victim on the platform, told her that everything was going to be okay, and carried her downstairs. After Kennedy, Fink and the victim provided the police with a description of the offenders, they were taken to a hospital for treatment.[2]

Officer Gene Harris, assigned to the 19th District Tactical Unit of the Chicago police department, received an emergency dispatch on the night in question at approximately 12:25 a.m. He and his partner proceeded to the Belmont and Sheffield "el" station to intercept the southbound train on which defendants were riding. At the train station, the two police officers boarded the first car of the two-car south-

---

[2]Approximately 10 days following the rape and deviate sexual assault, the victim noticed blisters in her vaginal area; she was subsequently diagnosed as having contracted genital herpes.

bound "el" when it arrived; three other Chicago police officers boarded the second car. Officer Harris then began to search for persons matching the description of the rapists. He observed six of the nine defendants seated across from each other, conversing in the rear of the first car. After obtaining their addresses and ordering them off of the train, Officer Harris placed Dennis King, Darrell King, Danny Gholston, David Love, Anthony Hart and Joseph Thurmond under arrest.

On the morning of December 28, 1980, the six defendants arrested at the Belmont station were identified in a lineup. The victim recognized Dennis King, Danny Gholston, David Love and Darrell King; Kennedy recognized Danny Gholston and Joseph Thurmond; Fink recognized Anthony Hart and Joseph Thurmond. Anthony Gholston and Jerry Cummings were arrested later that day. Kenneth Gholston was arrested on January 18, 1981. Following interviews conducted by Irving Miller, an assistant State's Attorney assigned to the Area 6 Felony Review Unit, incriminatory statements were obtained from Kenneth Gholston, David Love, Danny Gholston, Jerry Cummings, Anthony Gholston and Dennis King. Thereupon, each of the nine defendants were charged by indictment with rape, deviate sexual assault, indecent liberties with a child, two counts of robbery, five counts of aggravated battery, and two counts of conspiracy to commit robbery.

On November 10, 1981, Anthony Hart pleaded guilty to robbery and aggravated battery. On November 16, 1981, Joseph Thurmond also pleaded guilty to robbery and aggravated battery. That same day, November 16, Darrell King entered a plea of guilty to all charges. Hart and Thurmond each received a concurrent term of seven-years' imprisonment; Darrell King received a concurrent term of 20 years' imprisonment. Two jury trials and four bench trials were thereafter conducted in a single proceeding as to the six remaining defendants. Following Jerry Cummings' bench trial, he was found guilty of robbery, aggravated battery and conspiracy to commit robbery; Cummings was sentenced to a concurrent term of seven years' imprisonment, but is not involved in this appeal.

Regarding the judgments of conviction and sentence of the five defendants involved in this appeal, Anthony Gholston and Dennis King, following bench trials, were found guilty as charged and sentenced, respectively to concurrent terms of 25 and 30 years' imprisonment. Following a jury trial, Danny Gholston was found guilty of rape, deviate sexual assault, one count of indecent liberties with a child, two counts of robbery, three counts of aggravated battery, and

one count of conspiracy to commit robbery. The sentence imposed was a concurrent term of 50 years' imprisonment. Following a bench trial, David Love was found guilty as charged and sentenced to an aggregate term of imprisonment. The specific length of such term, as hereinafter discussed, is not clearly ascertainable. Following a jury trial, Kenneth Gholston was found guilty of rape, deviate sexual assault, one count of indecent liberties with a child, two counts of robbery, three counts of aggravated battery, and one count of conspiracy to commit robbery. The sentence imposed was an aggregate term of 258 years' imprisonment.[3] Specifically, Kenneth Gholston was sentenced to a consecutive term of 60 years' imprisonment for the rape conviction, plus 60 years' imprisonment for the deviate sexual assault conviction, plus 30 years' imprisonment for each of the two *charges* of indecent liberties with a child, plus 14 years for each of the two robbery convictions, and 10 years' imprisonment for each of the five *charges* of aggravated battery. All of the terms were to run consecutively. The conspiracy to commit robbery conviction was merged into the two robbery convictions.

It is the propriety of these convictions and sentences which defendants now contest on appeal.

I

Initially, defendants David Love, Dennis King and Danny Gholston contend that there existed no probable cause for their arrests at the Belmont "el" station on the early morning of December 28, 1980.

■ Probable cause for purposes of arrest is present when the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution to believe that an offense has been committed, and that the person arrested has committed the offense. (*People v. Lippert* (1982), 89 Ill. 2d 171, 178, 432 N.E.2d 605, *cert. denied* (1982), 459 U.S. 841, 74 L. Ed. 2d 85, 103 S. Ct. 92.) Mere suspicion that the person arrested has committed an offense is insufficient grounds for arrest; however, it is well settled that the probable cause standard does not require the arresting officer to have in his hands evidence sufficient to convict the accused. *People v. Moody* (1983), 94 Ill. 2d 1, 7, 445 N.E.2d 275; *People v.*

---

[3]Kenneth Gholston maintains that the court sentenced him to an aggregate term of 208 years' imprisonment. However, our review of the *mittimus* indicates that defendant failed to include in his calculations (1) the 30-year term of incarceration imposed on a second count of the indecent liberties charge, and (2) both of the 10-year terms of incarceration imposed on the fourth and fifth counts of the aggravated battery charge.

*Marino* (1970), 44 Ill. 2d 562, 573, 256 N.E.2d 770.

██ A determination as to whether or not probable cause for an arrest exists in a particular case depends upon the totality of facts and circumstances known to the officers at the time of arrest. (*People v. Cobb* (1983), 97 Ill. 2d 465, 485, 455 N.E.2d 31.) In deciding the question of probable cause in any given case, the courts are not to be unduly technical; rather, they are to deal with probabilities, *i.e.*, the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. *People v. Creach* (1980), 79 Ill. 2d 96, 102, 402 N.E.2d 228, *cert. denied* (1980), 449 U.S. 1010, 66 L. Ed. 2d 467, 101 S. Ct. 564.

Moreover, during any probable cause analysis, we must consider that police officers are often required to act upon a quick appraisal of the data before them. As a result, the reasonableness of their conduct must be judged on the basis of their responsibility to prevent crime and to apprehend criminals. *People v. Robinson* (1976), 62 Ill. 2d 273, 277, 342 N.E.2d 356.

Following the rape and deviate sexual assault of the victim, she explained to the engineer of a stopped northbound train what had happened. An order was immediately dispatched from the train to stop the last southbound "el" that had just left the Thorndale station. Very soon thereafter, the victim provided the police with specific descriptions of the offenders. Fink and Kennedy also talked to police officers for several minutes at the Thorndale station. The details given at this time included approximate ages, heights and sizes of the members of the group of black males, as well as specific colors and styles of their coats, jackets and pants.

During the hearing on defendants' motions to quash arrest, Officer Harris testified that he received two dispatches on the night in question at approximately 12:25 a.m. He immediately proceeded with his partner to the Belmont and Sheffield "el" station to intercept the southbound train which had just left the Thorndale station. The two police officers were given a description of 10 to 12 black males, ranging in age from "17 to 20, middle 20's," wearing tan and rust-colored jackets. One of the males was described as wearing a long, dark trenchcoat, while another was described as wearing a dark-colored cap.

Upon their arrival at the Belmont station, Officer Harris and his partner met with five other police officers. When the designated train pulled into the station, the officers told the engineer not to continue southbound and they then split up into two groups. Officer Harris and his partner entered the first car of the two-car "el." All of the black male occupants seated in the front and middle of this car were dis-

missed as suspects since they were all in their late 20's or older. However, as the two police officers proceeded into the rear portion of the first car, they observed six black males seated across from each other, facing the center of the aisle and conversing with one another.

Regarding their personal characteristics, Officer Harris testified that "the guys were in the age range that was on the broadcast. They had similar clothing. They had tan jackets. *** The Kings had tan jackets on. Danny Gholston had a rust-colored jacket on, and this was—they had black caps on, small with bibs. *This was the description we had received.*" (Emphasis added.) In addition, "David Love had blue jeans on, black leather jacket covered by a three-quarter length gray coat *** that was one of the descriptions."

Upon request, the six defendants then gave Officer Harris "west side addresses, 5000 some west on Washington, somewhere north on Long, and in that area like that."[4] It was this evidence of geographical proximity from which Officer Harris could reasonably infer that the group of six black males he observed conversing in the rear of the "el" car were, at the very least, acquainted with one another. Such an acquaintance, manifested by riding together in the early morning hours on an "el" not near their alleged addresses, could suggest to an alert police officer, along with the other facts known to him at that time, that these persons were the subjects referred to in the emergency dispatch.

■■ ■ In essence, considering the totality of facts and circumstances at the time of the arrests, Officer Harris had more than a mere suspicion. He had a reasonable belief based on his 17 years of experience as a Chicago police officer, that the six black males he observed in the rear of the "el" train were the perpetrators of the gang rape and deviate sexual assault of the victim. Since defendants' arrests were lawfully made with probable cause, we hold that the trial court correctly denied their motions to quash these arrests. As defendants' incriminating statements were not, therefore, "fruit of the poisonous tree" (See *Wong Sun v. United States* (1963), 371 U.S. 471, 488, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417), the court also properly denied their corollary motions to suppress such incriminatory evidence.

## II

The next issue for consideration concerns the propriety of the

---

[4]The distance from the Kings' residence on Washington to the Gholstons' residence on Long is within a city block.

trial court's denial of defendant Anthony Gholston's motion to suppress inculpatory oral and written statements. Specifically, Anthony argues that his confession was involuntarily obtained due to his alleged belief that an assistant State's Attorney was his own lawyer. Thus, it is urged that any statements made by defendant were privileged.

The criterion used by Illinois courts for admission of a confession is "whether the confession was made freely, voluntarily, and without compulsion or inducement of any sort." (*People v. Young* (1983), 115 Ill. App. 3d 455, 462, 450 N.E.2d 947.) The test for voluntariness is whether the defendant's will was overborne at the time he made the inculpatory statement. (*People v. Kincaid* (1981), 87 Ill. 2d 107, 117, 429 N.E.2d 508, *cert. denied* (1982), 455 U.S. 1024, 72 L. Ed. 2d 144, 102 S. Ct. 1726.) The burden is upon the State to establish by a preponderance of the evidence that the confession was voluntarily made (*People v. Wallace* (1983), 114 Ill. App. 3d 242, 247, 448 N.E.2d 910); a finding of voluntariness will not be disturbed on review unless it is contrary to the manifest weight of the evidence (*People v. Davis* (1983), 97 Ill. 2d 1, 20, 452 N.E.2d 525).

In determining whether a confession was voluntarily given, a court of review is to consider the totality of circumstances surrounding its making rather than any one individual factor. (*People v. Childers* (1981), 94 Ill. App. 3d 104, 110, 418 N.E.2d 959, *cert. denied* (1982), 455 U.S. 947, 71 L. Ed. 2d 661, 102 S. Ct. 1448.) "Factors to be considered include the giving of *Miranda* warnings, the time elapsed between the arrest and the confession, the presence of any intervening circumstances, and the flagrancy and purpose of the official misconduct." *People v. Lester* (1981), 102 Ill. App. 3d 761, 765, 430 N.E.2d 358.

Regarding the instant action, Assistant State's Attorney Miller testified in open court that, prior to the *Miranda* warnings, "I advised [Anthony Gholston] that I was an Assistant State's Attorney and not his personal attorney, that I was working with the police based on my functions as a Felony Review State's Attorney." Miller further explained to defendant that he "worked with the Police Department to determine what charges were to be placed against individuals." Detective Lawrence Flood of the Chicago police department, assigned to Area 6 Violent Crimes, was present during Anthony's interview. Detective Flood testified that Miller "told him who he was. He told him he was an Assistant State's Attorney and not his attorney."

In essence, based upon our review of the record, defendant's

assertion that he thought Miller was his own attorney lacks any serious merit. Anthony did not testify in support of this assertion but instead relies upon such a statement in his verified motion to suppress. It is inconceivable how the State's Attorney could have explained his occupation, as well as his purpose for interviewing defendant, with more clarity and simplicity. Furthermore, there is no evidence that defendant was in any way mistreated, threatened, or denied water or lavatory facilities. There is no evidence that he was physically abused or harassed; indeed, defendant even told Miller that the police had treated him "okay." There is no evidence that Anthony suffered from retardation or any other mental handicap, and there is no indication that he was the recipient of promises or misrepresentations. Viewing all of the evidence surrounding the making of defendant's incriminatory statement, a finding of voluntariness is, therefore, not against the manifest weight of the evidence. Since an opposite conclusion is not clearly evident, the trial court did not err in denying defendant's motion to suppress.

### III

We next focus on the propriety of conducting two jury trials and four bench trials in a single proceeding. Defendants Kenneth and Danny Gholston were each tried in the same courtroom by separate juries, while simultaneously, defendants Anthony Gholston, King, Love and Cummings each received a bench trial. These separate trials took place as the result of defendants' motions for severance based on statements allegedly given by each defendant.

### A

Defendants King and Anthony Gholston contend that their simultaneous bench trials resulted in prejudicial error. Specifically, they cite error in the fact that the victim identified each offender in open court; that Assistant State's Attorney Miller read the content of each defendant's statement during the course of the bench trials; and that each defense counsel "played his own defendant off against the others."

■ In Illinois, a trial judge, due to his particular training and experience, is regarded as having a greater ability than a jury to restrict the use of improper evidence. (*People v. McNeal* (1977), 56 Ill. App. 3d 132, 138, 371 N.E.2d 926, *appeal denied* (1978), 71 Ill. 2d 604.) Consequently, "where a trial is had without a jury there is a presumption that the trial court considered only competent evidence and that presumption can be overcome only where the record affirma-

tively shows the contrary." (*People v. Alford* (1982), 111 Ill. App. 3d 741, 744, 444 N.E.2d 576, citing *People v. Gilbert* (1977), 68 Ill. 2d 252, 258-59, 369 N.E.2d 849.) From our review of the record, we discern no such showing to the contrary. In fact, the trial was conducted by an experienced and capable trial judge.

The trial court properly considered the in-court identifications of the defendants which were made by the victim in corroboration of her previous, positive lineup identifications. The court properly admitted into evidence the incriminatory statements, the voluntariness of only one which has been contested on this appeal. Further, there is absolutely no indication that the court, as trier of fact, improperly considered the inculpatory statements of one offender as substantive evidence against any of the other offenders.

■ Regarding the "playing off" of each defendant by his respective attorney, "it is presumed that the trial court will disregard all improper arguments by counsel." (*People v. O'Malley* (1982), 108 Ill. App. 3d 823, 829, 439 N.E.2d 998, *appeal denied* (1982), 92 Ill. 2d 571.) Defendants have failed to show that the trial court relied upon such argumentation in reaching its findings of culpability. Rather, it is clear that the evidence implicating defendants Dennis King and Anthony Gholston was admitted only after a proper foundation was adequately established by the prosecution. Indeed, the sufficiency of the evidence proving guilt beyond a reasonable doubt has not been challenged by these two defendants on appeal. We find nothing in the record to justify deviating from the sound presumption that a court in a bench trial considers only competent evidence in determining guilt or innocence.

## B

Defendants Kenneth and Danny Gholston claim that the simultaneity of their jury trials resulted in a denial of their due process rights.

■ As a general rule, "[a]n accused does not have a right to be tried separately from his companions when charged with offenses arising out of a common occurrence." (*People v. Ruiz* (1982), 94 Ill. 2d 245, 257, 447 N.E.2d 148, *cert. denied* (1983), 462 U.S. 1112, 77 L. Ed. 2d 1341, 103 S. Ct. 2465; see also, *People v. Earl* (1966), 34 Ill. 2d 11, 13, 213 N.E.2d 556.) In the interests of fairness, however, should it appear that an offender will be prejudiced by a joinder of defendants for trial, "*** the court may order separate trials, grant a severance of defendants, or provide any other relief as justice may require." (Ill. Rev. Stat. 1979, ch. 38, par. 114—8.) Whether separate

trials should be granted is, therefore, a matter addressed to the sound discretion of the trial court; such a decision will not be reversed absent an abuse of that discretion. *People v. Lee* (1981), 87 Ill. 2d 182, 186, 429 N.E.2d 461; *People v. Sanford* (1983), 116 Ill. App. 3d 834, 840, 452 N.E.2d 710, *appeal denied* (1983), 96 Ill. 2d 564.

██ Regarding the case at bar, the trial court, by ordering separate jury trials for defendants Kenneth and Danny Gholston, avoided a possible conflict with the principles articulated in *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, and its progeny.[5] The fact that these two jury trials were conducted simultaneously in one courtroom before a single judge was constitutionally permissible. (*People v. Ruiz* (1982), 94 Ill. 2d 245, 259; *United States v. Sidman* (9th Cir. 1972), 470 F.2d 1158, 1169-70, *cert. denied* (1973), 409 U.S. 1127, 35 L. Ed. 2d 260, 93 S. Ct. 948.) It has also been held that this procedure has statutory foundation in Illinois. Ill. Rev. Stat. 1979, ch. 38, par. 114—8; *People v. Church* (1981), 102 Ill. App. 3d 155, 164, 429 N.E.2d 577.

Nonetheless, defendants Kenneth and Danny Gholston argue that they were each deprived of an impartial trial by virtue of the fact that the victim was allowed to testify before both juries at the same time; that she was allowed to identify defendants in court and from lineup photographs; that Assistant State's Attorney Miller was permitted to testify before each jury separately; that he had interviewed and obtained statements from defendants; and that the microanalyst was allowed to testify, before the Kenneth Gholston jury, as to the results of the spermatozoa and mucus examinations.

██ Under Illinois decisional law, the two-jury procedure is acceptable "where a defendant is given every opportunity to present a complete defense before one jury, cannot point to any event which confused the jury or affected its ability to render a decision fairly, and the record shows that the trial judge adequately prepared the jurors for the procedure ***." (*People v. Church* (1981), 102 Ill. App. 3d 155, 164-65.) Absent any showing of prejudice, a court of review cannot speculate as to any impropriety in the procedure. *People v. Smith* (1981), 94 Ill. App. 3d 969, 976, 419 N.E.2d 404.

---

[5] In *Bruton*, the Supreme Court reversed the armed robbery conviction of a defendant who had been implicated through the introduction, during a joint trial, of his codefendant's extrajudicial confession. The Court held that when the codefendant was not called to testify, the admission of such an incriminatory statement deprived defendant of his rights under the confrontation clause (U.S. Const. amend. VI) *Bruton v. United States* (1968), 391 U.S. 123, 137, 20 L. Ed. 2d 476, 485-86, 88 S. Ct. 1620, 1628-29.

The record in the present case is replete with admonitions by the lower court to each jury that its sole concern was the particular offender whose guilt or innocence they would eventually determine. The experienced trial judge exercised great care and patience in stressing repeatedly the nature of each jury's responsibilities, as finder of fact, and that what would happen with respect to the other defendants was of no consequence to its consideration of the ultimate issue of criminality. It is also readily apparent that the court exercised great caution in retiring each jury when certain inculpatory evidence not relevant to its respective case was introduced. Defendants Kenneth and Danny Gholston each concede that his incriminatory statements were read in full only to his own jury. Regarding the other defendants' statements, error is claimed simply because both of the juries became aware that such evidence was in existence, and that all of the defendants implicated one another through these statements. This claim of error, however, lacks merit since Kenneth and Danny Gholston's trial lawyers engendered this awareness during their opening statements before their respective juries. Essentially, both trial attorneys revealed that their clients had already been implicated by several statements obtained from the other defendants.

Because a substantial portion of the State's testimonial evidence proffered during the course of the proceedings was admissible as against all of the defendants, two simultaneous jury trials were certainly preferable in the interests of judicial economy. Although Kenneth and Danny Gholston adamantly contend that it was improper to allow the victim to testify and make in-court identifications before both juries, our query during oral argument still remains unanswered: How did this particular strategy on the part of the prosecution result in manifest prejudice? As defendants acknowledge, the trial court had a legitimate concern for minimizing the extreme trauma to the youthful victim reliving her ordeal over several court appearances spread out over a number of months. By failing to demonstrate prejudicial error, defendants' mere allegation that such a limitation of courtroom exposure was an "imprudent solution" is, in our opinion, a legally insufficient basis upon which to predicate an outright reversal of their convictions.

Likewise, the fact that Kenneth Gholston's jury was present when Officer Lenz testified as to the results of the spermatozoa and mucus examinations performed on the clothing of several defendants does not, in itself, constitute reversible error. First, such evidence was probative of the criminality for which, as the State had maintained during trial, Kenneth Gholston should be held accountable. Second,

the totality of evidence establishing Kenneth Gholston's guilt beyond a reasonable doubt was overwhelming; a challenge as to the sufficiency of this inculpatory evidence is not even before this court.

 In essence, defendants were given every opportunity to present a complete defense before their respective juries. Both Kenneth and Danny Gholston have failed to demonstrate how their specific citations of error affected either jury's ability to render a fair decision. Although we recognize the possibility of confusion inherent in the multiple jury procedure, we find nothing in the record before us indicative of prejudicial error. Therefore, we cannot speculate as to any impropriety in the two jury trials below. Indeed, we commend the trial judge for not only thoroughly preparing the jurors for this procedure, but for conducting a very complex, arduous proceeding in a highly judicious manner.

## IV

We now consider whether certain evidentiary rulings made by the lower court resulted in prejudicial error.

## A

First, defendant Love argues that the State failed to show a continuous chain of possession prior to the introduction of his blue jeans and white undershorts into evidence.

 In establishing a sufficient chain of possession, the prosecution is not required to exclude all possibility of tampering. (*People v. Winters* (1981), 97 Ill. App. 3d 288, 295, 422 N.E.2d 972, *cert. denied* (1982), 455 U.S. 923, 71 L. Ed. 2d 464, 102 S. Ct. 1282.) In the absence of any specific suggestion of alteration, substitution or tampering, it is sufficient for the State to prove only a reasonable probability that the evidence has not changed in any important respect. (*People v. Witanowski* (1982), 104 Ill. App. 3d 918, 925, 433 N.E.2d 334; *People v. Rhoades* (1979), 74 Ill. App. 3d 247, 252, 392 N.E.2d 923, *appeal denied* (1979), 79 Ill. 2d 623.) We hold that the State adequately established such a reasonable probability.

During the proceedings below, Detective Mannion testified that soon after defendant Love arrived under custody at Area 6, his clothing was removed, inventoried, placed in a plastic bag that was tied at the top, and sent down to the crime lab. The Area 6 inventory procedure entails the immediate completion of both a slip that is attached to the bag and a small, white piece of paper that is placed inside the bag. At trial, Detective Mannion identified People's group exhibit No. 19 as the clothing taken from defendant Love. Officer Lenz, the mi-

croanalyst, testified that these clothes were "brought into the crime lab in a sealed condition in a plastic bag." The inventory slip was checked with the white piece of paper inside the bag "[t]o make sure it was the right inventory for the right bag of clothing and the same case number." Defendant's clothing was packed into a cardboard box and stored in the evidence and recovered property section until a request for analysis was made. The subsequent analysis of defendant Love's Jockey undershorts revealed spermatozoa and mucus encrustations. The trial court stated that it regarded the chain of custody intact, and subsequently ruled this incriminating evidence admissible.

 Under the circumstances present in the case at bar, it is clear that the State met its burden of showing a sufficient chain of custody. Continuity of possession of the clothing was adequately established through the testimony of Officers Mannion and Lenz. No evidence of alteration, substitution or tampering was presented, much less suggested. As a consequence, we hold that no reversible error occurred when Love's clothing was introduced into evidence.

### B

Defendants Dennis King, Danny, Anthony[6] and Kenneth Gholston argue that prejudicial error occurred when the trial court permitted the victim to testify that she was diagnosed as having contracted genital herpes approximately 10 days following the gang rape and deviate sexual assault.

 " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (Fed. R. Evid. 401; *People v. Free* (1983), 94 Ill. 2d 378, 413, 447 N.E.2d 218.) "Relevancy is established where a fact offered tends to prove a fact in controversy or renders a matter in issue more or less probable." *Marut v. Costello* (1966), 34 Ill. 2d 125, 128, 214 N.E.2d 768.

 Applying the foregoing definition of "relevant evidence," it is clear the victim's testimony concerning her condition of genital herpes was relevant as tending to prove defendants' sexual abuse of the victim on the night in question. It was the evidence of a sexually

---

[6]Anthony Gholston's trial attorney stated that he did not care whether or not the evidence of genital herpes was ruled admissible. The written motion for new trial filed on Anthony Gholston's behalf failed to include this alleged error. Since the evidence establishing his guilt was not closely balanced, we consider Anthony Gholston's contention with regard to this matter as having been waived for review. See *People v. Berry* (1984), 99 Ill. 2d 499, 503.

transmissible disease[7] that was probative of the physical contact element necessary to establish the three sex offenses for which defendants were charged.

■■■ Defendants nonetheless argue that the prejudicial impact of this testimonial evidence outweighed its probity. To the contrary, from our review of the instant record, we find no such manifest prejudice. Taken in its entirety, the incriminatory evidence adduced at the trial below was overwhelming. Indeed, defendants Dennis King, Danny and Kenneth Gholston do not even contest the sufficiency of evidence establishing their guilt beyond a reasonable doubt.

V

Defendant Love contends that he was not proved guilty beyond a reasonable doubt of the offenses for which he was charged and convicted.

During the trial below, the victim testified that after Danny Gholston got off of her as she lay on the "el" platform, David Love stated that "he was going to get his" as he exchanged places with Danny Gholston. Soon thereafter, when a southbound train was approaching the Thorndale station, David Love and another person picked the victim up by the hair and arm, and threw her down onto the tracks. Defendant Love then jumped off of the platform, pulled the victim by the hair into the snow and raped her. Afterwards, as the young girl cried and begged Love not to kill or hurt her, Love "raised his arm and hit me really hard upside my face—on the side of my face." Love then walked back toward the tracks and boarded the southbound train.

It is now argued by defendant that "the horrible events affected [the victim] to the point that her identification of [him] cannot be relied upon." Further, defendant asserts that a minor discrepancy as to the color of his pants warrants reversal of his convictions.

■■■ ■■ In Illinois, it is uncontroverted that "[t]he credible testimony of a single witness who viewed defendant under circumstances that would permit a positive identification is sufficient to support a conviction." (*People v. Johnson* (1982), 109 Ill. App. 3d 511, 519, 440 N.E.2d 992, *appeal denied* (1983), 92 Ill. 2d 576; see generally *People v. Vriner* (1978), 74 Ill. 2d 329, 343, 385 N.E.2d 671, *cert. denied* (1979), 442 U.S. 929, 61 L. Ed. 2d 296, 99 S. Ct. 2858.) "The test of a positive identification is whether the witness was close enough to the

---

[7] See The Merck Manual of Diagnosis and Therapy sec. 21 at 1768-69 (R. Berkow, M.D., ed. 1977).

accused for a sufficient length of time under conditions adequate for observation." (*People v. Brown* (1982), 110 Ill. App. 3d 1125, 1128, 443 N.E.2d 665, *appeal denied* (1983), 93 Ill. 2d 543.) Factors to be considered in evaluating the likelihood of a misidentification include: (1) the opportunity of the witness to view the accused at the time of the offense; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the defendant; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the offense and such confrontation. *Neil v. Biggers* (1972), 409 U.S. 188, 199-200, 34 L. Ed. 2d 401, 411-12, 93 S. Ct. 375, 382-83.

The present record evinces that the victim viewed defendant Love under circumstances which would permit a subsequent positive identification. She observed Love twice at close range, both before and after she was thrown off of the platform onto the tracks. In addition to seeing defendant get on top of her as she lay on the lighted platform, complainant also observed defendant for a period of three to four minutes underneath the platform where "[t]here was light coming through." In corroboration of the positive identification of defendant Love during trial, the State proffered testimonial evidence of the victim's unequivocal pretrial identification of the accused. This occurred during a police lineup conducted within a matter of hours after Love raped and beat complainant.

Furthermore, a microanalyst employed by the Chicago police department discovered spermatozoa and mucus encrustations on the Jockey shorts that were taken from defendant Love soon after his arrest. Defendant himself admitted to Officer Phillip Mannion of the Chicago police department, and to Assistant State's Attorney Miller, that he "went along [on the night in question] to rob people for a few dollars. But things kind of got carried away." The voluntariness of this incriminatory statement has not been challenged on appeal.

▮▮ As for the minor discrepancy in Love's trouser identification, it is well settled that where a witness makes a positive identification, precise accuracy in the preliminary description is not necessary. (*People v. Brown* (1982), 110 Ill. App. 3d 1125, 1129; *People v. Goodman* (1982), 109 Ill. App. 3d 203, 217, 440 N.E.2d 345.) "[I]t is contrary to human experience to make an identification by noticing first the *** clothes of a person ***. Ordinarily all features are viewed at once and the recognition made instantaneously or not at all. This is one of the reasons why minor discrepancies in identification do not require reversal." *People v. Ervine* (1965), 64 Ill. App. 2d 82, 87, 212 N.E.2d 346, *appeal denied* (1966), 33 Ill. 2d 625.

██ We find the victim's identification of defendant Love was reliable in light of the totality of circumstances. Without question, the law commits to the trier of fact the determination of the credibility of witnesses, the weight to be given to their testimony and the inferences to be drawn from the evidence. (*People v. Akis* (1976), 63 Ill. 2d 296, 298, 347 N.E.2d 733; *People v. Ahern* (1983), 119 Ill. App. 3d 532, 536, 456 N.E.2d 852.) "[T]hat determination will not be reversed unless the evidence is so improbable as to create a reasonable doubt ***." (*People v. Davis* (1983), 95 Ill. 2d 1, 27, 447 N.E.2d 353.) The trial court evaluated the victim's credibility and subsequently found defendant guilty beyond a reasonable doubt of the crimes for which he was charged. Since the identifications of Love are not so dubious that any serious doubt of his guilt can be raised, there exists no basis upon which to reverse the trial judge's determination of guilt.

## VI

The final issue raised by defendants concerns the propriety of sentencing.

## A

Defendant Love argues that the lower court failed to make the specific finding that a consecutive term of imprisonment was required to protect the public from his further criminal conduct. Love additionally contends that no basis exists in the record for the imposition of his consecutive sentence.

Section 5—8—4(b) of the Unified Code of Corrections provides that:

> "The court shall not impose a consecutive sentence unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—4(b).

██ Defendant Love's first argument for a reduction of his sentence must fail since section 5—8—4(b) "does not require the trial judge to specifically repeat the statutory language in order to make the required finding that a consecutive sentence is necessary for the protection of the public although to do so would be the better practice." *People v. Logan* (1983), 117 Ill. App. 3d 753, 759, 453 N.E.2d 1317.

Defendant Love's assertion that the record is devoid of any basis

for the imposition of consecutive terms of imprisonment is equally without merit. As the trial court aptly stated on the record, defendant Love's participation in the crimes displayed his mental thoughts and "his actions enhanced the heinous nature of the offense to the extent that I feel that the extended term and consecutive sentences, where they have been imposed are warranted." It is unnecessary to reiterate at this point the horror and humiliation that Love put the victim through as he "got his" on the night in question. We also note that at defendant's sentencing hearing, the prosecution informed the sentencing judge that defendant, after he was taken into custody for the instant offenses, raped an inmate of the Cook County Department of Corrections. In view of defendant Love's abhorrent propensity to commit sex crimes, the imposition of consecutive sentences cannot be said to have lacked evidentiary substantiation.

As indicated earlier in this opinion, we note a lack of a clear sentencing record as to counts 3 and 4, the indecent liberties counts, regarding defendant Love's convictions. In imposing the sentence on these charges, the court stated that: "David Love, it is the sentence of this court that you be *** [incarcerated] *** for a period of twenty-five years on the charge of indecent liberties ***." However, the circuit court half-sheet reflects that defendant received two consecutive 25-year terms of imprisonment for his *two* (counts 3 and 4) indecent liberties convictions. Thus, the half-sheet entry is in conflict with the trial court's sentence pronouncement from the bench, and the *mittimus* fails to indicate a sentence determination as to count 4 of the indictment on which defendant was found guilty, *i.e.*, sexual intercourse with a child under the age of 16 years. Ill. Rev. Stat. 1979, ch. 38, par. 11—4(a)(1).[8]

██ From our review of the order of sentence and commitment, it appears that consecutive sentences were intended with respect to the indecent liberties and the robbery convictions. In view of the nature of consecutive sentencing, we remand this cause for resentencing on count 4 in order that the total record is consistent.

## B

Defendants Dennis King and Anthony, Danny and Kenneth Gholston suggest that the trial court was unconcerned with their rehabilitative potential in that it imposed the sentences of imprisonment

---

[8]Count 3 of the indictment on which defendant Love was found guilty concerned deviate sexual conduct with a child under the age of 16 years. Ill. Rev. Stat. 1979, ch. 38, par. 11—4(a)(2).

solely for purposes of punishment. To the contrary, our review of the record indicates that the court was fully aware of defendants' personal traits, their ages, their educational as well as employment backgrounds, and their family situations. Further, the sentencing judge provided defense counsel with ample opportunity, which they each fully utilized, for argument in mitigation.

■■■ "[R]ehabilitation and the seriousness of the offense are to be accorded equal weight in fixing punishment, and the prime responsibility for striking the proper balance between the two factors rests with the trial court." (*People v. Crosser* (1983), 117 Ill. App. 3d 24, 32, 452 N.E.2d 857.) The fact that the trial judge here had no "hope" for the rehabilitation of the defendants is not, in itself, indicative of failure to *consider* whether or not there was such hope.

■■■ Defendants' claim of error regarding the lack of "consistency" in sentencing between all of the offenders must similarly fail. Mere disparity in sentencing between defendants, without more, does not warrant reduction of the punishment imposed by the trial court. (*People v. Thompson* (1967), 36 Ill. 2d 478, 482, 224 N.E.2d 264, *cert. denied* (1967), 389 U.S. 870, 19 L. Ed. 2d 151, 88 S. Ct. 155; *People v. Mick* (1980), 86 Ill. App. 3d 1022, 1028, 408 N.E.2d 1079.) Furthermore, in Illinois, a trial court's determination of a sentence involves consideration of the subjective circumstances presented in each individual case, *i.e.*, the offender's mentality and general moral character, his abnormal or subnormal tendencies, and his natural inclination or aversion to commit crime. *People v. Dukett* (1974), 56 Ill. 2d 432, 452, 308 N.E.2d 590, *cert. denied* (1974), 419 U.S. 965, 42 L. Ed. 2d 180, 95 S. Ct. 226; *People v. Reese* (1984), 121 Ill. App. 3d 977, 989.

■■■ Recognizing that the trial court's determination of a sentence is entitled to great deference and weight on appeal, we are of the opinion that, based upon a review of the record in the present case, the sentences imposed on defendants David Love, Dennis King, Anthony and Danny Gholston should not be reduced. However, as the State concedes, the maximum term of imprisonment that defendant Kenneth Gholston could have received was "*** the sum of the maximum terms authorized under Section 5—8—2 for the two most serious felonies involved." (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—4(c)(2).) Since the maximum extended term of imprisonment for either rape or deviate sexual assault is 60 years (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2(a)(2)), defendant Kenneth Gholston's sentencing order is modified to reflect an aggregate term of 120-years imprisonment. The details of the modification will be hereinafter described.

■■■ In addition, the sentencing order pertaining to Danny Ghol-

ston incorrectly reflects two counts of indecent liberties with a child and two counts of aggravated battery; the sentencing order pertaining to Kenneth Gholston incorrectly reflects two counts of indecent liberties with a child and five counts of aggravated battery. Since these defendants were each convicted of one count of indecent liberties with a child and three counts of aggravated battery, the lower court's orders must be corrected accordingly.

Kenneth Gholston's sentencing order is modified as follows: Defendant is sentenced to a term of 60 years' imprisonment for rape (count 1) and 60 years' imprisonment for deviate sexual assault (count 2). The sentences on counts 1 and 2 are to be served consecutively with one another. The remaining sentences as to defendant Kenneth shall be concurrent with the aforesaid sentences and with each other.

## VII

The State's motion before this court to strike that part of defendants Dennis King, and Anthony, Danny and Kenneth Gholstons' brief which contains matters that are *dehors* the record is granted.

Essentially, the assistant appellate defender has incorporated copies of newspaper clippings, dating from December 29, 1980 to January 1, 1982, into Appendix B of defendants' opening brief. By virtue of this photocopied material, it is now argued that extensive publicity may have played a role in the trial judge's sentencing determinations.

■■■ In the absence of a stipulation between the parties, matters outside the record cannot be considered by this court on review. (*People v. Reese* (1984), 121 Ill. App. 3d 977, 983, citing *People v. Haas* (1981), 100 Ill. App. 3d 1143, 1149, 427 N.E.2d 853.) Regarding the instant case, there is no allegation by any of the defendants that the lower court was informed prior to sentencing that its determination would possibly be influenced by any form of public pressure. Nor is there any indication in the record the defendants sought a change of venue, before trial, due to any alleged prejudicial publicity. Moreover, the various photocopied newspaper articles contained in Appendix B to defendants' brief were never introduced, much less proffered, into evidence during any stage of the proceedings below. Since there was neither a stipulation between the parties, nor a request made to this court seeking permission to supplement the record with the photocopied newspaper coverage, we hereby grant the State's motion to strike that part of defendants' brief which is *dehors* the record.

## CONCLUSION

For the foregoing reasons, the State's motion to strike is granted;

the judgments of conviction are affirmed; the sentencing orders with respect to defendants Dennis King and Anthony Gholston are affirmed; the sentencing orders with respect to defendants Danny and Kenneth Gholston are corrected in accordance with the views expressed herein; and the cause as to defendant David Love is remanded to the circuit court of Cook County for resentencing on count 4.

HARTMAN, P.J., and PERLIN, J., concur.