# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Morris*, 2013 IL App (1st) 111251

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HERBERT MORRIS, Defendant-Appellant. |
| District & No. | First District, Fifth Division <br> Docket No. 1-11-1251 |
| Filed | September 30, 2013 |
| Rehearing denied | November 1, 2013 |
| Held <br> (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for first-degree murder was affirmed where there was a sufficient foundation for the admission of his bloodstained pants and boots, his public defender was not ineffective in failing to introduce evidence to challenge the chain of custody of clothing exhibits or in failing to object to the State's latent fingerprint analysis, the trial court did not err in barring defendant from showing a still frame from a video recording of him in an interrogation room in order to impeach the testimony of a police officer, and the threats defendant made shortly before the offense to two young men who were staying at the house where it occurred were properly admitted to show defendant's anger and jealousy that led to the killing. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-1512; the Hon. Arthur F. Hill, Jr., Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Philip D. Payne, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Yvette Loizon, and Lori M. Rosen, Assistant State's Attorneys, of counsel), for the People. |
| | |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion. |
| | Justices McBride and Palmer concurred in the judgment and opinion. |

## OPINION

¶ 1        Following a jury trial, defendant Herbert Morris was convicted and sentenced to 55 years in the Illinois Department of Corrections for the first-degree murder of Clinton Cavin, who was found dead hours after engaging in an argument with defendant on the morning of November 15, 2006. At trial, witnesses testified that defendant's then-girlfriend, Sharon Smith, left her home early that morning to drive to Iowa, and before she left, she asked Cavin, who lived in the basement, to watch her house while she was gone. This request angered defendant, who frequently spent time at Sharon's house. Defendant then slapped Sharon and demanded that Cavin leave, and defendant later threatened to cut the throats of Sharon's teenage son, Abel Smith, and his friend, Harold Jackson, who also lived in the house.

¶ 2        Later that morning, Harold and his friend, William Alston, observed defendant leave the house and return 15 minutes later with a knife. They locked the front door and left the house through the side door to walk to a nearby gas station, and when they returned two minutes later, they observed defendant down the street walking away from the house. Inside, they observed a bloody shovel leaning against the wall, and then discovered Cavin dead in the basement. William called the police, and defendant was arrested at his parents' house.

¶ 3        Upon his arrest, the police observed bloodstains on defendant's clothing and boots, and forensic scientists later tested samples of the bloodstains and determined that they matched Cavin's DNA profile. The blood recovered from the shovel also matched Cavin's DNA profile, and a palm print recovered from the handle of the shovel matched defendant's prints. An expert in forensic pathology examined Cavin's autopsy files and opined that Cavin's death was a homicide, having died as a result of blunt-force trauma to the head.

¶ 4        On this direct appeal, defendant claims, first, that his conviction should be reversed and remanded for a new trial because defendant was deprived of his right to due process and a fair trial by three related chain-of-custody errors: (1) the trial court admitted defendant's

bloodstained pants and boots into evidence despite the State's failure to establish a chain of custody; (2) that the assistant public defender provided ineffective assistance of counsel at trial by not introducing defendant's hospital belongings list into evidence to show that defendant's boots were not seized at that time; and (3) the trial court prohibited the defense from presenting a still shot from a videotape of an unidentified officer seizing the boots in an interrogation room at the police station. Second, defendant claims that the trial court committed reversible error when it allowed the State to present testimony that defendant had made threatening remarks to Abel and Harold the morning of the homicide. Third, defendant claims that his trial counsel was ineffective for not objecting to the State's fingerprint analysis. Despite being represented by counsel on appeal, defendant has also filed a *pro se* supplemental appellate brief raising numerous additional claims of ineffective assistance of counsel and trial court errors at the suppression hearing and at trial. For the following reasons, we affirm.

¶ 5                                   BACKGROUND

¶ 6                              I. Pretrial Proceedings

¶ 7        Prior to trial, defendant was represented by the public defender. On October 7, 2008, the defense filed a motion to quash arrest and suppress evidence due to a lack of probable cause. A suppression hearing was held on March 30, 2009, and the trial court heard testimony from defendant's mother, Beverly Morris, and two arresting police officers, Daniel O'Connor and Deronis Cooper. Beverly testified that, on November 15, 2006, one officer knocked on her door and asked about her son, while another officer pushed past her and entered her house without her consent and without a search or arrest warrant. The officers then went upstairs and arrested defendant. Officers O'Connor and Cooper both testified that they had received a flash message[1] that described defendant as a murder suspect and that he lived at his parents' house, and that Beverly had given them permission to enter her home. After arguments, the trial court denied defendant's motion, finding: (1) that defendant's mother consented to the search of her house prior to defendant's arrest; (2) that the arresting officers had probable cause to arrest defendant based on the information they had at the time; and (3) that the arresting officers were justified in searching the home without a warrant due to exigent circumstances.

¶ 8        At the next hearing, on June 10, 2009, defendant informed the trial court that he wanted to proceed *pro se*, and the trial court ordered a behavioral clinical examination, in which a doctor opined that defendant was fit to represent himself. After a 30-day continuance, the trial court found defendant fit to stand trial, admonished defendant of his rights to self-representation, and allowed the assistant public defender to withdraw.

¶ 9        As a *pro se* litigant, defendant attempted to file a second motion to suppress evidence on January 28, 2010. In his motion, defendant argued that, after he was arrested in his parents' home, the police should have obtained a search warrant from a magistrate judge prior to

---

[1]A flash message is a broadcast of updated information from the crime scene that is transmitted to all responding officers.

seizing two knives in the house along with defendant's clothing. Defendant further argued that the assistant public defender was ineffective for failing to make this argument at the prior suppression hearing. The trial court advised defendant that he could not litigate the issue a second time because the trial court already ruled on the merits of defendant's motion to quash arrest and suppress evidence. In response, defendant explained that the public defender "provided ineffective assistance of counsel" because she "suppressed" evidence that showed that she counseled the police officers to perjure themselves at defendant's suppression hearing. The trial court declined to consider defendant's *pro se* motion, explaining that his allegations were appellate issues and that defendant could raise those issues on appeal.

¶ 10    Afterward, defendant requested counsel, and the assistant public defender was reappointed on March 3, 2010. Despite being represented by counsel, defendant filed a *pro se* motion *in limine* concerning ineffective assistance of this same counsel at the suppression hearing. The trial court advised defendant that he may not file a motion when he is represented by an attorney, and defendant requested to proceed *pro se* a second time. The trial court again admonished the defendant and again excused the same assistant public defender. Defendant then argued a *pro se* motion *in limine*, claiming that the police did not have probable cause to enter his parents' home and arrest him, and that the assistant public defender was ineffective because she "suppressed" the arrest report and did not call the officer who issued the flash message to testify at the suppression hearing. Following arguments, the trial court denied defendant's *pro se* motion, finding that the trial court had already ruled on the probable cause issue in defendant's motion to quash arrest and suppress evidence. Defendant noted for the record that he disagreed with the trial court's ruling.

¶ 11    At the next court date, on May 27, 2010, defendant filed a *pro se* "Motion in Limine Regarding Knowing Use of False or Perjured Testimony Constituting a Denial of Due Process in Response to Court Order Whether Pro-Se Defendant is Ready for Trial." Defendant explained that he had uncovered new evidence that the assistant State's attorney violated defendant's constitutional due process rights when she knowingly presented false testimony from Officer Cooper at the suppression hearing. Also, defendant's *pro se* motion argues that the assistant public defender provided ineffective assistance of counsel because she continued to ask Cooper misleading questions, despite knowing that he had testified falsely.[2] The case was continued so that defendant could file an answer to discovery, and at the next court appearance, defendant requested counsel.

¶ 12    On June 30, 2010, the trial court reappointed the same assistant public defender a third time. Defendant objected to the appointment and informed the trial court that he had a case pending against this assistant public defender in federal court. The trial court asked defendant about the nature of the federal case, and defendant explained that he had sued this assistant public defender for "fabrication of statements in a sworn affidavit." Specifically, defendant alleged that, at the suppression hearing, his counsel fabricated the evidence in "the complaint that was signed by the officer that made the 911 call" because the officer that wrote the

---

[2]The appellate record is silent concerning the disposition of defendant's *pro se* motion.

-4-

complaint was not called to testify. The assistant public defender explained that defendant may have confused the arrest report with the general offense case report, which were prepared by different police officers. The arresting officer testified at the suppression hearing that he was not aware of certain facts that were reported in the general offense case report, which contained more detailed information about defendant's arrest. The assistant public defender explained that defendant's May 27, 2010, *pro se* motion also pointed to the arresting officer's general progress report, which contained information that the officer had learned only after defendant's arrest. The trial court then asked the assistant public defender if she had written the arrest report or any of the police reports in defendant's case, and she answered that she had not. Defendant then argued that, at the suppression hearing, the assistant public defender claimed that evidence was in the arrest report that is not there, to which his counsel responded that she merely impeached the officer by omission when she elicited testimony from the officer that he did not state something in his police report. The trial court stated that it had just "conducted what we'll term a *Krankel*, which is usually posttrial, but call this a 'mini-*Krankel*' hearing," and it found that the assistant public defender would remain on defendant's case, despite his pending action against her in federal court.

¶ 13    On September 14, 2010, defendant attempted to file a *pro se* motion pursuant to Illinois Supreme Court Rule 415 (eff. Oct. 1, 1971). Defendant attached to his *pro se* motion a written request to the clerk of the circuit court of Cook County, Illinois, requesting a copy of his arrest report. The trial court struck defendant's *pro se* filing, finding that only his attorney may file documents. Defendant then requested a third time to proceed *pro se*, and the trial court denied this third request.

¶ 14    At a later proceeding, on November 5, 2010, defendant attempted to file an additional *pro se* motion for substitution of judge for cause and to again reconsider the denial of his motion to quash arrest and suppress evidence. Defendant's *pro se* motion repeated his arguments that the arresting officers lacked probable cause and that the assistant public defender provided ineffective assistance of counsel, though defendant did not address his substitution of judge claim in the body of his motion. Defendant's counsel informed the trial court that she did not intend to file defendant's motion on his behalf. The trial court subsequently bifurcated the *pro se* motion and denied defendant's request for substitution of judge.

¶ 15    On November 29, 2010, defense counsel filed a motion *in limine* to bar evidence of other crimes and bad acts, including evidence: (1) that defendant slapped his girlfriend the night before the murder; and (2) that defendant threatened Harold Jackson and Abel Smith the next morning that he would cut their throats. The trial court denied defendant's motion, finding that these incidents described a "continuing course of conduct, which the jury could see, leads up to and includes the murder of Mr. Clinton Cavin."

¶ 16    A jury was selected on February 28, 2011, and the trial began the next day.

¶ 17                                  II. Trial

¶ 18    At trial, the State argued in its opening statement that, on November 15, 2006, defendant

beat Clinton Cavin to death with a shovel after Cavin refused defendant's demand to leave Sharon Smith's home. The State presented 15 witnesses, including two arresting police officers, forensic examiners that handled the evidence in the case, and defendant's then-girlfriend, Sharon Smith, and her three sons. Defendant exercised his right not to call witnesses or testify at trial.

¶ 19                                A. Sharon Smith's Testimony

¶ 20        Sharon Smith testified that, in November 2006, she lived in Chicago, Illinois, in a house owned by Maurice Simmons, the father of one of her three sons. Sharon slept in the downstairs bedroom, while her sons, Christopher Simmons, Abel Smith, and Dezell Smith, occupied the bedrooms on the second floor. The victim, Clinton Cavin, lived in the basement. The front door of the house opened into the living room, and a back door accessed the basement. Sharon's boyfriend of five years, defendant, lived in the house off and on, as well as three of Abel's friends, William Alston, Walter Alston, and Harold Jackson. At the time, Abel was 17 years old and went to school, while his friends Harold and William were 19 and 20 years old, did not attend school, and were unemployed. Defendant occasionally used various tools to do maintenance work around the house.

¶ 21        Sharon testified that, on November 14, 2006, she hosted a party at the house to celebrate her birthday, in which her friend Renee Tate, Kenny Marshall, defendant, Maurice, and Maurice's friend Nakita Marshall attended. During the party, which continued past midnight, Sharon and Renee smoked crack cocaine in her bedroom, while defendant, Cavin, Kenny, Nakita, and Maurice drank alcohol and smoked crack cocaine in the basement. Sharon's three sons and their friends, William, Walter, and Harold, stayed upstairs in their bedrooms during the party.

¶ 22        Sharon testified that, at 2 a.m., she prepared to leave the party with Kenny and Renee to drive to Iowa to attend an 11:30 a.m. public housing appointment. Sharon went into the basement and asked Cavin to watch the house while she was in Iowa. After her conversation with Cavin, defendant, who had been drinking and smoking crack cocaine, slapped Sharon across the face. Sharon cried, ran back upstairs, and told her son Abel that defendant slapped her. She then went outside, and defendant acted upset that she was leaving for Iowa. Sharon then asked defendant to accompany her to Iowa, and defendant went inside the house to get his coat. Sharon waited for defendant but he never came back out, so she, Kenny, and Renee left without him. Sharon did not return to her home until 7:30 p.m. the next day.

¶ 23        On cross-examination, Sharon admitted that, when she returned home from Iowa, she told detectives that she had left at 5 a.m., and not 2 a.m. as she had just testified.

¶ 24                                B. Maurice Simmons' Testimony

¶ 25        Maurice Simmons testified that, on November 14, 2006, he left work at 10:30 p.m. and attended Sharon's birthday party. Maurice smoked crack with the adults in the basement and on the first floor, while the minors stayed in the upstairs bedrooms. Shortly before 2 a.m. the next morning, Maurice and Nakita observed defendant arguing in the basement with Cavin because defendant wanted Cavin to leave the house. The argument was a "small, little thing,"

and Maurice thought it was "no big deal." Sharon then left for Iowa at 2:30 a.m., and Maurice and Nakita went to sleep in Sharon's bedroom and awoke at 7 a.m. to send the kids off to school. At that time, Maurice observed defendant in the house without blood on his clothes. Maurice went back to sleep and was awakened at noon by Harold and William, who told him that Cavin was dead in the basement. Maurice then went down into the basement and observed Cavin's body. Maurice then left the house and used a neighbor's telephone to call 911, and the dispatcher told him that someone had already called and the police were on their way. Maurice identified defendant in court.

¶ 26        On cross-examination, Maurice testified that he did not remember if he left work at either 10:30 p.m. or 1 a.m. the next morning, and that it took him 30 minutes to drive from his job to Sharon's party. The defense asked Maurice whether he told the police that he observed Sharon leave at 5 a.m., and he testified that he did not remember saying that to the police. Maurice also testified that he did not speak with Abel at any point that morning.

¶ 27                        C. Christopher Simmons' Testimony

¶ 28        Christopher Simmons testified that, at the time of trial, he was 21 years old. On November 14, 2006, he lived with his mother and he never left the house during her birthday party. Christopher observed defendant at the party drinking and "having fun." Christopher went to sleep shortly after midnight, and he awoke at 1:30 a.m. to use the downstairs bathroom. Christopher observed defendant downstairs but he did not speak to defendant before he went back to bed because defendant "looked kind of mad." Christopher then went back upstairs to sleep, and he and Abel left for school the next morning. Christopher also identified defendant in court.

¶ 29                        D. Renee Tate's Testimony

¶ 30        Renee Tate testified that she and Sharon celebrated their birthdays together on November 15, 2006, at Sharon's residence. Renee planned on accompanying Sharon and Kenny on a short trip to Iowa. Before they left, Sharon asked defendant to join them and he went inside the house to retrieve his jacket, but he never came back outside, so they left without him. Renee did not remember what time they left, and she did not learn of Cavin's death until she returned to Chicago. Renee also identified defendant in court.

¶ 31        On cross-examination Renee testified that, though she did not remember when they left for Iowa, she arrived at the party at 12:30 a.m. and stayed for two hours. When asked if she had told the police that they left the party at 4:30 a.m., she stated, "If that's what I told him, that's what happened." Renee also testified they arrived at Sharon's appointment late.

¶ 32                        E. Abel Smith's Testimony

¶ 33        Abel Smith testified that, at the time of trial, he was 22 years old, and he lived with his mother, Sharon Smith, in November 2006. On November 15, 2006, Abel was in the house during his mother's birthday party, and he fell asleep on the couch in the living room at 1 a.m. He was awakened later by the sound of Sharon arguing with defendant. Sharon then told

Abel that defendant had slapped her, and Abel asked defendant not to hit his mother. Sharon later left for Iowa, and Abel attempted to go back to sleep, but he could not sleep because defendant was talking to himself and pacing in the kitchen. Abel asked defendant to leave because he was disturbing the house, but defendant said that he refused to go unless Cavin left first. Abel responded that Cavin was homeless and that he had nowhere to go, but defendant replied that he would throw Cavin out of the house himself. Defendant then threatened to cut Abel's throat.

¶ 34    Abel testified that he left the kitchen and went in the basement to check on Cavin, who appeared to be fine. Abel next went upstairs to check on the other kids, and he told Maurice that defendant was disturbing him. Maurice told Abel that he would check on it, so Abel went to an upstairs bedroom and attempted to sleep, but he was kept awake by the sound of someone punching the kitchen walls. Abel then heard defendant arguing in the basement with Cavin, who told defendant that he was not going anywhere and "[i]f you hurt me, you're not doing nothing but hurting yourself." Though he stated that he did not hear Cavin mention defendant's name, he acknowledged that he had previously testified before a grand jury that he had heard Cavin say, "Herb, what are you doing in the basement with me."

¶ 35    Abel testified that he eventually fell back asleep and woke up again at 4 a.m. He checked on Cavin again, and he observed defendant drinking vodka and pacing in the kitchen. Abel went back upstairs and went to sleep again. Abel woke up again at 7:30 a.m. to prepare for school. He went downstairs and observed defendant pacing in front of the basement door, but he did not observe a shovel or any blood on defendant. Abel then washed up, ironed his clothes, and left for school with his brothers. Abel also identified defendant in court.

¶ 36    On cross-examination, Abel testified that he was convicted of robbery in 2006.

¶ 37                    F. William Alston's Testimony

¶ 38    William Alston testified that he was 24 years old and that, in November 2006, he lived at Sharon's residence because he had problems with his father. After Sharon's birthday party, William went to sleep and was awakened in the morning by Maurice, who asked to use his cellular telephone. That morning, William and Harold went downstairs to make some breakfast. Defendant entered the kitchen and started breathing on Harold's food. When Harold asked him to stop, defendant threatened to cut Harold's throat. Harold pushed defendant away, and defendant left the home driving Maurice's vehicle.

¶ 39    William testified that defendant returned 15 minutes later, and William observed him standing by the vehicle in front of the house with a knife protruding from his jacket pocket. Defendant attempted to conceal the knife as he approached the house, and William quickly locked the front door before defendant reached it. Defendant then knocked on the door, while William and Harold exited through a side door and walked to a nearby gas station to purchase cigarettes. They did not lock the side door when they left, and Maurice and Nakita were still in the house at the time.

¶ 40    William testified that, when he and Harold returned to the home two minutes later, he observed defendant walking down the street seven houses away from them. Defendant was wearing a leather coat, blue jeans, and construction boots. William did not observe any blood

on defendant's clothing, nor did he observe defendant holding a shovel. William identified defendant in court, and he identified the leather coat, jeans, and boots in court as the same clothes that he observed defendant wearing on November 15, 2006.

¶ 41    William testified that he and Harold reentered the home and William knocked over a shovel and he picked it up and placed it back where it was leaning against the wall. The shovel was usually kept in the basement, and William observed that it had blood on the back, but the handle appeared to be dry. William identified the shovel in court. He then walked down into the basement to check on Cavin, who lived in the basement with Sharon's brother, Joey.[3] William observed bloody footprints on the basement stairs. In the basement he found Cavin's body, and he immediately returned upstairs and told Maurice and Harold what he had observed. William then walked down the street to his father's home to call the police. After the police arrived, William rode in a police vehicle and directed the officers to where defendant lived.

¶ 42                    G. Sergeant Daniel O'Connor's Testimony

¶ 43    Chicago Police Sergeant Daniel O'Connor testified that, on November 15, 2006, he and his partner, Officer Costello,[4] were dressed in plain clothes when they responded to a homicide at Sharon's home at 11:30 a.m. Upon arriving at Sharon's residence, he received a flash message that described the suspect as a 40- to 50-year-old black male named Herb, who had been observed leaving the house wearing a black leather jacket, dark-colored jeans, and boots, and armed with a wood-handled knife. After receiving the flash message, O'Connor and his partner drove to defendant's residence and knocked on the front door. Defendant's mother answered the door and had a conversation with O'Connor before allowing him and his partner to enter the house. O'Connor and his partner walked upstairs and observed defendant lying face-up on a bed. Defendant stood up and O'Connor observed that he was wearing a denim shirt, black jeans, and tan boots, and that defendant's jeans and boots had reddish-brown stains on the front of them. O'Connor also observed a leather jacket in the room with a knife protruding from the pocket, as well as a second knife with a wooden handle. O'Connor photographed the room and the photographs were admitted into evidence at trial. O'Connor identified defendant in court. O'Connor also identified defendant's denim shirt, black jeans, and tan boots, and pointed to where he observed the bloodstains on the clothing.

¶ 44    On cross-examination, O'Connor testified that, despite observing blood on defendant's clothes, O'Connor did not recover and seal defendant's pants and boots prior to taking defendant to the police station because he did not want to strip defendant naked of his clothes. O'Connor noted that he did not observe bloodstains on the white bed sheets, on defendant's skin, or under defendant's fingernails. O'Connor admitted that he did not write in his report that the flash message informed him that defendant was armed with a knife.

---

[3]This was the first and only mention of Joey during the trial. None of the other witnesses mentioned that he lived in the basement with Cavin. William did not state Joey's last name.
    [4]Officer Costello's first name does not appear in the appellate record.

¶ 45                    H. Officer Deronis Cooper's Testimony

¶ 46        Chicago Police Officer Deronis Cooper testified that, on November 15, 2006, he was wearing civilian clothes and driving through the area near Sharon's home. In the late morning, he received a flash message that a black male suspect was observed in the vicinity, wearing a black coat, black jeans, and work boots, and potentially covered in blood. Cooper drove through the area but did not observe the suspect. He then drove to Sharon's residence, where he spoke with William and Nakita. After speaking with them, Cooper drove to defendant's residence, while Cooper's supervisor drove William and Nakita there.[5] Officers O'Connor and Costello were already at defendant's home when Cooper arrived. Cooper entered the house and observed defendant lying on a bed in a second floor bedroom. Defendant was wearing a blue denim shirt, black jeans, and tan work boots, and he had dried red stains on his pants and boots. Cooper then arrested defendant and transported him to an interrogation room at the Area 2 police station, and he remained with defendant the entire time. Cooper identified defendant in court, and he identified defendant's pants and boots and noted that they were in the same or substantially the same condition as when he observed defendant wearing them in the bedroom.

¶ 47        On cross-examination, Cooper testified that he did not recall removing defendant's boots while defendant was in the interrogation room. After Cooper brought defendant to the interrogation room, other officers later transported defendant to a hospital to treat an injury unrelated to the instant case. Cooper testified that he knew that defendant's clothes were removed at the hospital, but he did not state who removed them.


¶ 48                          I. Victor Rivera's Testimony

¶ 49        Forensic investigator Victor Rivera testified that, at 1 p.m. on November 15, 2006, he and his partner, forensic investigator Eddie Perez, processed the evidence at the crime scene at Sharon's home. In the basement, Rivera observed Cavin's body slumped over in a chair and a bloody shovel leaning against the wall. Cavin's body was covered in blood, and there were bloodstains on the walls. Rivera identified the shovel and several photographs of Cavin's body in court. Rivera then left Sharon's home to process the evidence found at defendant's residence, which included a kitchen knife, a drywall knife, and a black leather jacket in defendant's bedroom. Rivera transported the evidence to the Area 2 police station where he assigned a unique inventory number to each item. Rivera identified the knives and jacket in court.

¶ 50        Rivera testified that, while he was at the Area 2 police station, he "recovered" defendant's clothing, but did not explain how he came into possession of defendant's clothes. Rivera identified defendant in court. The State presented Rivera with a pair of brown boots, socks, black jean pants, and a shirt, and he identified each article of clothing as the same one that he recovered from defendant on November 15, 2006, and that each item was in the same

---

[5]Cooper did not state his supervisor's name.

or substantially the same condition as when he recovered them.

¶ 51 On cross-examination, Rivera testified that he did not observe any bloody footprints on the basement stairs and that the shovel currently did not appear as bloody as it did when he recovered it. He did not observe any blood on defendant's leather jacket, and the knife protruding from defendant's jacket's pocket appeared to have rust on it rather than bloodstains.

¶ 52 In the middle of Rivera's cross-examination, the trial recessed an hour for lunch, and when it resumed, the trial court stated outside the presence of the jury, "The defense has been setting up audio/visual equipment as it relates to the cross-examination of Forensic Investigator Rivera. Be sure that our motion to exclude is being adhered to."[6] The defense then informed the trial court that it intended to present a still shot from a videotape that showed an unidentified police officer removing defendant's boots from his feet in an interrogation room at the Area 2 police station. The defense would first ask Rivera if he did in fact remove defendant's clothes from his person, and if he said no, then the still shot would not be shown. If he Rivera said yes, then the defense intended to show the still frame from the video and ask Rivera if any of the four people depicted in the still frame was him, with his anticipated answer being no. The trial court denied the defense's request to show the frame from the video, finding that "the still [shot] says nothing in terms of the entirety of the time that [defendant] was at the [police] station." The defense then informed the trial court that it intended to show the video without sound at some later date. The trial court responded that it would reserve its ruling until that issue presented itself, and the trial court again advised the defense that there would be no reference to the video during Rivera's cross-examination, even for the purposes of impeachment.

¶ 53 While the video was not played or admitted into evidence at trial, a DVD copy is contained in the appellate record. The video shows that a white male officer in plain clothes wearing a baseball cap led defendant into the interrogation room. Defendant was wearing a button-down collared shirt, black jeans, and tan boots with visible marks on them. Shortly afterward, a second dark-skinned male officer entered the room and emptied defendant's pockets, placing the contents on the table. This second officer was also not in uniform and was instead wearing a blue shirt, blue jeans, and a white baseball cap. Defendant then sat down on a bench and the second officer removed defendant's boots. A third black male officer wearing a gray shirt and pants, a black vest, and a flat cap entered the room holding a clear plastic bag. The second officer, while holding defendant's boots in his right hand, placed the contents of defendant's pockets into the bag and then left the room with the boots. The second officer returned to the room five minutes later without the boots in hand, and the boots do not appear on the rest of video. Defendant was then taken to the hospital, and the video recording system was shut off. The video recording resumed when defendant returned from the hospital, and the video shows that defendant reentered the interrogation room wearing hospital scrubs without shoes rather than his previous clothing.

---

[6]It is unclear which motion the trial court referred to because the appellate record does not contain a motion to exclude that concerns the presentation of a videotape at trial.

¶ 54    When the cross-examination resumed, Rivera testified that he could not recall if defendant was still wearing his original clothes and boots or new hospital scrubs when Rivera observed him in the interrogation room. Rivera also did not remember whether he personally removed defendant's clothing and boots, or if they were already removed from defendant before Rivera arrived at the Area 2 police station.

¶ 55                        J. Steven White's Testimony

¶ 56    Dr. Steven White of the Cook County Medical Examiner's Office testified as an expert in forensic pathology concerning the autopsy performed on Cavin by Dr. Michelle Jordan, who had since moved out of state. White testified that he reviewed Dr. Jordan's case protocol, photographs, and toxicology results to formulate his own opinion regarding Cavin's death. White identified multiple lacerations on Cavin's head and face, though he noted that Cavin's body lacked any signs of defensive wounds. Cavin had a comminuted fracture of the skull, which was broken into many pieces. White opined that Cavin died from multiple craniocerebral injuries resulting from blunt-force trauma to his head due to an assault. White opined that Cavin's death was a homicide, and that Cavin was alive and breathing when he sustained the injuries because there was blood found in his lungs and stomach. White was unable to determine a time of death.

¶ 57                        K. Lynette Wilson's Testimony

¶ 58    Lynette Wilson testified that she is a forensic biologist at the Illinois State Police Crime Lab, and that she analyzed the stains found on the shovel, the wood-handled knife, and defendant's boots, jeans, and denim shirt. Her tests revealed that all of these items contained blood on them. Wilson preserved each of the samples and sealed them in a vault for DNA analysis.

¶ 59    On cross-examination, Wilson testified that there is a possibility of a false positive test result. The jeans had many dirt-like stains on them, and the majority of the stains on the boots were scuffmarks and paint stains. While the boots have several blood-like stains on them, Wilson only tested one area.

¶ 60    After Wilson's testimony, the defense again informed the trial court that it intended to play the video without sound during its case-in-chief to show that someone other than forensic investigator Rivera recovered defendant's boots from the Area 2 interrogation room. The State argued that the video was inadmissible because the defense could not lay a proper foundation, and the trial court stated that, though the issue was not before the trial court at that time, it "probably would not" allow the video to be shown later.

¶ 61    The next morning, the defense requested the trial court that it recall Rivera to clarify whether he personally removed defendant's clothes. The defense also intended to question Rivera about the evidence inventory form that he completed, in which he left blank the

portion of the form indicating where the items were recovered or seized.[7] The trial court denied the defense's request to recall Rivera, finding that he testified that he was "not sure about how the clothes got to his possession," and that playing either a still or the entire interrogation video would not advance the defense's case either way. Afterwards, the defense did not request or attempt to play the video throughout the duration of the trial.

¶ 62                              L. Christopher Webb's Testimony

¶ 63        Christopher Webb testified that he is a DNA scientist at the Joliet Science Laboratory of the Illinois State Police, and that he tested the DNA samples found on the clothing, boots, and the shovel, and compared them to the DNA profiles of defendant and Cavin. A blood sample recovered from the cuff of defendant's shirt matched defendant's DNA profile, while blood samples recovered from defendant's jeans, boots, and the shovel matched Cavin's DNA profile.

¶ 64                              M. William Kovacs' Testimony

¶ 65        William Kovacs testified that he took defendant's fingerprints and palm prints on May 22, 2007, and forwarded them to the Illinois State Police latent print unit for comparison.

¶ 66                              N. Anastasia Petruncio's Testimony

¶ 67        Anastasia Petruncio testified that she is a fingerprint examiner, and that she examined the shovel and located four sets of prints on it: two on the plastic handle, and two on the metal base. One of the prints on the handle was suitable for comparison, and she identified the print as defendant's to the exclusion of all other individuals in the world. Petruncio demonstrated that the print on the handle corresponded to defendant gripping the shovel with his left hand. Petruncio identified the shovel at trial. Petruncio also examined the brown-handled knife, but found no prints suitable for comparison.

¶ 68        On cross-examination, Petruncio testified that one of the prints found on the shovel's metal base excluded both defendant and Cavin as the source. She did not compare the other two prints after she identified the palm print on the handle as defendant's. Petruncio did not receive print cards from any other individual for comparison. She acknowledged that it was impossible to tell when the prints were left on the shovel and that they possibly could have been left days, weeks, or months before the crime.

¶ 69        Defense counsel never requested a *Frye* hearing concerning the validity of latent palm print analysis, which is an issue defendant's counsel raises on appeal.

¶ 70                              O. Jennifer Acosta's Testimony

¶ 71        Jennifer Acosta testified that she is a forensic scientist at the Illinois State Police Forensic

[7]While the inventory form was not admitted into evidence at trial, it appears in the appellate record. The portion of form designated "recovered/seized from:" is left blank.

Science Center, and that she tested the DNA recovered from the wood-handled knife. She determined that the DNA sample contained a mixture of at least three profiles that she could not sort out. She compared the mixed profile to the DNA profiles of defendant and Cavin and determined that neither could be excluded as a possible match.

¶ 72      On cross-examination, Acosta testified that the DNA sample from the wood-handled knife was a degraded sample and that she did not know whether it came from blood or skin cells. Though defendant and Cavin cannot be excluded as a match, there are millions of potential combinations of DNA profiles that could yield the mixture found on the knife.

¶ 73      After Acosta's testimony, the State sought to admit defendant's boots, jeans, and shirt into evidence. The defense objected, arguing that the State failed to establish a sufficient chain of custody because Officer Rivera's testimony did not sufficiently explain how he came into possession of the clothing. The trial court overruled the defense's objection and admitted the clothing into evidence. The State rested, and the trial court denied defendant's motion for a directed verdict.

¶ 74      Defendant exercised his right not to testify or call witnesses at trial. The defense presented stipulated testimony from Chicago Police Detective Madden[8] to impeach Abel Smith. It was stipulated that, if called to the stand, Madden would testify that Abel told him on November 15, 2006, that Cavin had asked Abel to close the basement door when Abel checked up on him later that night. After speaking with Cavin, Abel went to go to sleep in his bedroom and he turned the volume up on his stereo so that it was loud. Madden would also testify that Abel did not mention that he observed defendant pacing in front of the kitchen door in the morning. The defense then rested.

¶ 75      During closing arguments, the State argued that defendant threatened to kill Cavin because he was jealous that Sharon, his girlfriend at the time, had asked Cavin to take care of her house while she was away. In response, the defense criticized the State's evidence and argued that the State did not prove defendant guilty beyond a reasonable doubt. Over the defense's objection, the jury was allowed to view the shovel and defendant's clothing during their deliberations. The jury later found defendant guilty of the first-degree murder of Clinton Cavin.

¶ 76                           III. Posttrial Proceedings

¶ 77      Prior to sentencing on April 7, 2011, defendant filed a *pro se* posttrial motion for a new trial based on ineffective assistance of counsel. The trial court held a *Krankel* hearing, and defendant argued that the boots admitted into evidence at trial did not belong to him. Defendant claimed that the police returned his boots and he wore his boots to the hospital, which the police would not have done had the boots been covered in blood. As proof, defendant claimed that the video of his interrogation at the Area 2 police station showed an officer taking defendant's boots and giving them back to him, and that the hospital inventory

---

[8]Detective Madden's first name does not appear in the appellate record.

list reflected the seizure of his pants, shirt, and socks at the hospital.[9] Defendant further argued that his counsel was ineffective because she did not use this information to impeach Officer Cooper and she did not call Harold Jackson as a defense witness. The trial court then questioned defendant's counsel, who explained that Harold had given a handwritten statement to the police and testified before a grand jury that defendant had threatened to cut his throat, and that Harold was generally not a favorable witness for the defense. Defendant's counsel also explained that she tried to admit the interrogation video or a still photo from the video during trial but the trial court denied her requests. The trial court denied defendant's *pro se* motion, finding that it would have applied its ruling denying the use of the interrogation video or still to Officer Cooper's testimony as well. The trial court further found that the *pro se* motion "lacked merit" and that it did not justify the appointment of new counsel.

¶ 78    On April 18, 2011, the defense filed a posttrial motion for a new trial, alleging that the trial court erred when it: (1) denied defendant's pretrial motion to quash arrest; and (2) denied defendant's motion *in limine* to bar evidence of other acts of defendant. Among the claims in the motion for a new trial, the defense argued that the trial court: (1) improperly denied the use of the interrogation video to impeach Rivera at trial; and (2) erred when it admitted defendant's boots, pants, shirt, and socks into evidence despite a broken chain of custody. The trial court denied the defense's motion, and defendant then advised the trial court that he had filed a *pro se* motion for "obstruction of justice" against the assistant public defender.[10] The trial court advised defendant that it had already ruled on these issues before, but it nevertheless held another "*Krankel*-type hearing" and denied defendant's *pro se* motion, finding that the assistant public defender offered a tactical reason for not calling Harold Jackson as a witness and that defendant did not need new counsel.

¶ 79    The trial court then held a sentencing hearing, and the State noted defendant's 1985 convictions for armed robbery and residential burglary. The State called three correctional officers from Cook County Jail to testify to three separate instances of defendant's insubordination and confrontation during the pendency of his case. The defense called Eric Morris, defendant's younger brother, who testified that defendant worked with their father as a plumber, that he had moved in with his parents as they were becoming older, and that defendant had taken care of Eric's son when Eric was too irresponsible to do so. Defendant then addressed the trial court and again claimed: (1) that the assistant public defender provided ineffective assistance of counsel; (2) that the police entered his parents' home without probable cause or a warrant; and (3) that there was a break in the chain of custody of his clothes. Following defendant's allocution, the State argued in aggravation that the way

---

[9]While the hospital inventory list was not admitted into evidence at trial, it appears in the record on appeal. The list indicates that defendant's shirt, pants, and socks were given to a police officer, while the "Shoes/Boots/Slippers" category is crossed off, indicating that no such items were recovered. Defendant did not sign the bottom of the list acknowledging that "the indicated items and disposition are correct and complete." However, the list is signed by "Sgt. E. Boone 1964" as the "Accepting Person," and another signature that is illegible appears below that as a "Witness."

[10]Defendant's motion does not appear in the appellate record.

in which defendant murdered Cavin was especially heinous, and that defendant had a long history of criminal behavior that continued even after he was incarcerated. In mitigation, the defense argued that the murder was the result of defendant's continuing struggle with substance abuse, and that defendant's actions in jail were actually minor relative to the environment that he lived in.

¶ 80       After considering the factors in aggravation and mitigation, the trial court considered that the manner in which defendant struck Cavin's head warranted a sentence "closer to the maximum as opposed to the minimum." The trial court sentenced defendant to 55 years' imprisonment, with 1,587 days of presentence custody credit against his sentence, and a $925 fine. The trial court denied defendant's motion to reconsider, and defendant appealed.

¶ 81       The Office of the State Appellate Defender, appointed on April 28, 2011, represents defendant on appeal. On July 25, 2012, appointed counsel filed a brief and argument on behalf of defendant. Defendant then filed a *pro se* brief and argument on March 20, 2013, entitled "Supplemental Breif [*sic*] and Argument For Defendant-Appellant Pursuant to Supreme Court Rule 341(b)." In his *pro se* brief, defendant makes numerous additional claims of trial court errors and ineffective assistance of counsel at the suppression hearing and at trial. Defendant states that his *pro se* brief is intended to supplement the briefs filed by his appellate counsel because his counsel chose not to raise these additional issues on appeal. Since defendant is represented by counsel and has made no request to proceed *pro se*, we will consider only the claims raised by counsel. *People v. McDonald*, 168 Ill. 2d 420, 435 (1995); *People v. Thompson*, 331 Ill. App. 3d 948, 951 (2002).

¶ 82                                            ANALYSIS

¶ 83       On appeal, defendant's counsel argues, first, that his conviction should be reversed and remanded for a new trial by three related chain-of-custody errors: (1) the trial court improperly admitted defendant's bloodstained pants and boots into evidence despite a deficient chain of custody; (2) the assistant public defender provided ineffective assistance of counsel at trial when she did not introduce the hospital belongings list into evidence to show that defendant's boots were not seized at the hospital; and (3) the trial court denied the defense's request to show a still shot from a video of an unidentified officer removing defendant's boots in an interrogation room at the police station. Second, counsel argues that the trial court erred when it denied the defense's motion *in limine* to bar testimony that defendant threatened to cut Abel Smith's and Harold Jackson's throats the morning of the homicide. Third, defendant's appellate counsel argues that the trial counsel was ineffective for not objecting to the State's latent fingerprint analysis. For the following reasons, we affirm.

¶ 84                                    I. Chain of Custody

¶ 85       The first claim is that the trial court erred when it admitted defendant's bloodstained pants and boots into evidence despite a break in the chain of custody. The admissibility of evidence lies within the sound discretion of the trial court, and the trial court's decision may not be overturned on appeal absent an abuse of discretion. *People v. Becker*, 239 Ill. 2d 215,

234 (2010). "An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court." *Becker*, 239 Ill. 2d at 234.

¶ 86   When the State seeks to introduce bloodstained clothing into evidence, it must lay an adequate foundation either " 'through its identification by witnesses or through a chain of possession.' " *People v. Woods*, 214 Ill. 2d 455, 466 (2005) (quoting *People v. Stewart*, 105 Ill. 2d 22, 59 (1984)). "[W]here an item has readily identifiable and unique characteristics, and its composition is not easily subject to change, an adequate foundation is laid by testimony that the item sought to be admitted is the same item recovered and is in substantially the same condition as when it was recovered." *Woods*, 214 Ill. 2d at 466.

¶ 87   In the case at bar, the State sufficiently established a foundation because defendant's pants and boots were readily identifiable by unique characteristics that were not easily subject to change. *Woods*, 214 Ill. 2d at 466. At trial, four witnesses identified the pants and boots as defendant's. First, the State presented the jeans and boots to William Alston, who identified them, along with defendant's leather jacket, as the clothing that he observed defendant wearing the morning of the crime. Next, Sergeant Daniel O'Connor identified defendant's jeans and boots as the same clothing that defendant was wearing at the time of his arrest. O'Connor also pointed out where he observed the bloodstains on defendant's pants. After that, Officer Deronis Cooper identified the black jeans and tan boots as the clothes that defendant was wearing at the time of his arrest. And lastly, forensic investigator Victor Rivera identified defendant's black jeans and boots as the items he recovered at the police station. Rivera testified that, besides the markings made by the crime lab, the items were in the same or substantially the same condition as when he recovered and inventoried the clothing.

¶ 88   As a result, the State established a sufficient foundation for defendant's pants and boots because four witnesses identified the articles of bloodstained black jeans and tan boots as defendant's. *Woods*, 214 Ill. 2d at 466. Because the State sufficiently laid a foundation for the pants and boots, it was not required to establish a chain of custody for the evidence to be admissible, and the trial court did not err when it allowed the items into evidence over the defense's objection. *Woods*, 214 Ill. 2d at 466. See *People v. Gilyard*, 124 Ill. App. 2d 95, 105 (1970) (the State established a sufficient foundation for hat and gloves found at the crime scene where witnesses identified the items as those worn by defendant during the crime); *People v. Kristovich*, 32 Ill. App. 3d 979, 985 (1975) (foundation sufficient where witness identified clothing exhibits as her own).

¶ 89   Defendant's counsel argues that since the pants and boots contained bloodstains, the State needed to establish a sufficient chain of custody, rather than witness identification, for the items to be admissible. Counsel argues that courts have found that blood is a highly fungible, highly transferrable substance that requires a chain of custody to ensure that the evidence is preserved and cites three cases: (1) *People v. Winters*, 97 Ill. App. 3d 288, 295-96 (1981) (discussing chain-of-custody requirements for admitting a blood sample); (2) *People v. Shiflet*, 125 Ill. App. 3d 161, 178-79 (1984) (chain of custody established for admission of a vial of victim's blood); and (3) *People v. Bradney*, 170 Ill. App. 3d 839, 864-65 (1988) (same). See also 725 ILCS 5/116-3 (West 2012) (procedure for securing postconviction DNA

testing requires defendant to establish a chain of custody for physical items to be tested).

¶ 90    Defendant's counsel also points to two 30-year old cases where courts applied a chain-of-custody analysis to clothing exhibits that contained biological material. In *People v. Gholston*, 124 Ill. App. 3d 873, 890-91 (1984), the appellate court analyzed the chain of custody of the defendant's pants and underwear that were later shown to contain mucus and spermatozoa. In *People v. Rogers*, 42 Ill. App. 3d 499, 501 (1976), the appellate court examined the chain of custody for bloody shorts admitted at trial. Counsel argues that, while foundation may have been proper for the articles of clothing alone, the fact that they contained visible samples of blood meant that the State was required to show a sufficient chain of custody to establish a foundation for the evidence.

¶ 91    However, the *Winters*, *Shiflet*, and *Bradney* cases cited by defendant's counsel concerned vial or samples of blood rather than bloody clothing. *Winters*, 97 Ill. App. 3d at 295-96; *Shiflet*, 125 Ill. App. 3d at 178-79; *Bradney*, 170 Ill. App. 3d at 864-65. While a sample of blood in itself may require a sufficient chain of custody for admissibility, the blood in the instant case was contained on unique articles of clothing that were identified by several witnesses at trial. Once the blood samples were recovered from the clothing, then they were subject to the chain-of-custody procedures used for samples of biological material. However, the defense never raised a challenge to the chain of custody of the blood after the samples were removed from the clothing.

¶ 92    Furthermore, while the appellate court in the *Gholston* and *Rogers* cases analyzed the chain of custody for clothing exhibits that contained biological material, neither case states that such an analysis is required or that the State must prove a chain of custody in such instances. *Gholston*, 124 Ill. App. 3d at 890-91; *Rogers*, 42 Ill. App. 3d at 501. Rather, our supreme court in *Woods* held that a chain of custody is not required where an item has readily identifiable and unique characteristics, and its composition is not easily subject to change. *Woods*, 214 Ill. 2d at 466. Since the composition of the pants and boots were not easily subject to change, and several witnesses identified the items through unique characteristics, the State did not need to establish a chain of custody. The State laid a sufficient foundation for the exhibits, and the trial court did not err when it admitted the pants and boots into evidence at trial.

¶ 93    Even if the State failed to establish a sufficient foundation, the trial court's error was harmless beyond a reasonable doubt. *People v. Thurow*, 203 Ill. 2d 352, 363 (2003) (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)). The evidence at trial showed that defendant was angered by Sharon's comments, and that he acted aggressively toward Cavin throughout the morning. Defendant was then observed approaching the house with a knife in his pocket, and then observed leaving the home shortly before Cavin was discovered dead in the basement. The police recovered a bloody shovel at the home, which contained defendant's fingerprints. Even if the clothing had been excluded at trial, there was still overwhelming evidence that defendant was guilty beyond a reasonable doubt.

¶ 94                        II. Hospital Belongings List

¶ 95    The second claim is that the assistant public defender provided ineffective assistance at

trial when she did not present defendant's hospital belongings list to challenge the chain of custody of the clothing exhibits. " 'The sixth and fourteenth amendment of the United States Constitution guarantee the fundamental right of a defendant in a criminal case to be effectively assisted by counsel.' " *People v. Young*, 347 Ill. App. 3d 909, 927 (2004) (quoting *People v. Spann*, 332 Ill. App. 3d 425, 429 (2002), citing U.S. Const., amends. VI, XIV). A successful claim of ineffective assistance of counsel requires a two-pronged showing: (1) that counsel's representation falls below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). If we can dismiss on the second prong for failure to show prejudice, we need not discuss the first prong. *Albanese*, 104 Ill. 2d at 527.

¶ 96 With respect to the second prong, defendant's appellate counsel argues that the assistant public defender failed to present the hospital belongings list at trial to attack the chain of custody of defendant's pants and boots. The list shows that defendant's pants, shirt, and socks were removed at the hospital and given to a police officer, presumably Sergeant Boone, who then signed the form. Counsel argues that the list would have had had the effect of proving a gap in the chain of custody, since forensic investigator Rivera testified that he recovered the clothes at the Area 2 police station and did not state Boone obtained possession of the items first.

¶ 97 However, the assistant public defender's performance did not prejudice defendant because, as discussed in section I, the State was not required to prove a chain of custody for defendant's clothing. *Woods*, 214 Ill. 2d at 466. Even if the hospital belongings list were presented at trial, it would have had no effect on the outcome of the case because the State laid a proper foundation for defendant's pants and boots through witness identification. *Woods*, 214 Ill. 2d at 466.

¶ 98 Also, as previously stated in section I, even if the clothing had been excluded at trial, there was still overwhelming evidence that defendant was guilty beyond a reasonable doubt. The evidence at trial showed that defendant acted aggressively toward Cavin and threatened him, that defendant was observed in the house near the time of the murder, and that defendant's fingerprints were on a bloody shovel found at the crime scene. Since defendant was not prejudiced by his counsel's failure to present his hospital belongings list, the assistant public defender did not provide ineffective assistance of counsel, and we need not consider counsel's performance with respect to the first prong. *Strickland*, 466 U.S. at 690; *Albanese*, 104 Ill. 2d at 527.

¶ 99                                III. Exclusion of the Interrogation Video

¶ 100 The third claim is that the trial court erred when it barred the defense from showing a still frame from a video recording of defendant in an Area 2 interrogation room. A trial court's finding concerning whether evidence is relevant and admissible will not be reversed absent a clear abuse of discretion. *People v. Morgan*, 197 Ill. 2d 404, 455 (2001) (citing *People v. Hayes*, 139 Ill. 2d 89, 130 (1990)). As stated, "[a]n abuse of discretion occurs where the trial court's decision is arbitrary, fanciful or unreasonable [citation] or where no reasonable

person would agree with the position adopted by the trial court." *Becker*, 239 Ill. 2d at 234.

¶ 101     The federal constitution guarantees the right of an accused to present a defense, including evidence to rebut the State's version of events. U.S. Const., amend. VI; *Washington v. Texas*, 388 U.S. 14, 19 (1967); *People v. Manion*, 67 Ill. 2d 564, 576 (1977). "Evidence is admissible if it is relevant to an issue in dispute and its prejudicial effect does not outweigh its probative value." *People v. Ross*, 395 Ill. App. 3d 660, 678 (2009) (citing *People v. Patterson*, 192 Ill. 2d 93, 114-15 (2000)). "Evidence is considered relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of an action either more or less probable than it would be without the evidence." *Morgan*, 197 Ill. 2d at 455-56 (citing *People v. Illgen*, 145 Ill. 2d 353, 356-66 (1991)). A trial court may bar evidence on the grounds of relevancy if the evidence is remote, uncertain, or speculative. *Morgan*, 197 Ill. 2d at 456 (citing *People v. Cloutier*, 156 Ill. 2d 483, 501 (1993)).

¶ 102     Defendant's counsel argues in its brief that the defense twice sought to present a "short video clip depicting an unnamed officer seizing [defendant's] boots at Area 2 before [defendant] was taken to the hospital," and that the trial court barred this evidence both times. This is an incorrect statement of the facts because the appellate record shows that the defense never attempted to play a video clip at trial. Rather, during the cross-examination of forensic investigator Rivera, the defense informed the trial court that it intended to present a still frame from the video, and the trial court denied the request. Afterwards, before the State rested, the defense twice informed the trial court that it intended to play a clip of the video in the future during its case-in-chief, but both times the trial court stated that the issue was not yet before the trial court, though it "probably would not" allow the video to be presented later. The defense never actually attempted to play the video at any other time at trial.

¶ 103     As a result, our review is limited to the trial court's decision to bar the defense from presenting a still frame of the video during Rivera's cross-examination. Rivera testified on direct examination that he "recovered" defendant's boots. During the cross-examination, the defense informed the trial court that it intended to show a single frame from the video, which would show three police officers in an Area 2 interrogation room with defendant. The defense stated that it would first ask Rivera if he personally removed defendant's boots, and if Rivera said no, the still video would not be presented. If Rivera said yes, then the defense would present the still shot and ask Rivera if he was one of the officers depicted in the frame, with his anticipated answer being no. The trial court barred the presentation of a still frame, and when the cross-examination resumed, Rivera explained that, although he recovered defendant's boots at the Area 2 police station, he did not recall who personally removed defendant's boots. On appeal, defendant's counsel argues that the trial court improperly barred the presentation of a still video frame because it would have impeached Rivera, who had just testified that he recovered defendant's boots. *Vancil v. Fletcher*, 90 Ill. App. 2d 277, 284 (1967) (finding defendant may impeach a witness's equivocal answers); *Edward Don Co. v. Industrial Comm'n*, 344 Ill. App. 3d 643, 652 (2003) (finding impeachment proper where witness denies making prior inconsistent statement or gives unequivocal answers to question concerning prior statement); *People v. Preston*, 341 Ill. 407, 419 (1930) (same). Additionally, counsel argues that the still video is relevant because it attacks the weight of

the evidence by showing that the police's handling left a break in the chain of custody for defendant's boots. The trial court did not err when it barred the defense from showing a still shot from the video because it was not impeaching Rivera's testimony. Although Rivera testified that he "recovered" defendant's boots at the Area 2 police station, he did not state that he actually removed the boots from defendant's feet. When asked on cross-examination to clarify how he came into possession of defendant's boots, Rivera stated that he did not recall if he personally removed defendant's boots or if another police officer had removed them before Rivera arrived at the police station. Since Rivera testified that he only recovered the boots and did not personally remove them from defendant, video evidence of another police officer removing defendant's boots does not impeach or contradict Rivera's testimony.

¶ 104     Furthermore, as the trial court correctly noted, the still image shows only one moment from the entire time that defendant was in custody, which is inconclusive to the question of who removed the boots from defendant's feet. A still video image would not impeach Rivera because the presentation of a single moment in time would not be determinative of whether he recovered defendant's boots. Also, presenting a still image would not undermine the boots' chain of custody because it would be impossible to determine who actually removed the boots, which police officers handled the boots, and how the boots were inventoried. As we explained in section I, four witnesses identified the boots as belonging to defendant, and the State was not required to demonstrate a chain of custody to lay a sufficient foundation. *Woods*, 214 Ill. 2d at 466. Thus, the trial court did not err when it barred the defense from presenting a still video shot that neither impeached Rivera nor undermined the State's evidence.

¶ 105     Also, the trial court's error was harmless beyond a reasonable doubt because, as discussed in sections I and II, the evidence against defendant was overwhelming. *Thurow*, 203 Ill. 2d at 363 (citing *Olano*, 507 U.S. at 734). The evidence at trial showed that defendant had a motive and opportunity to kill Cavin, and that his palm prints were discovered on the murder weapon. Even if the defense had impeached Rivera, there was still overwhelming evidence that defendant was guilty beyond a reasonable doubt.

¶ 106                    IV. Verbal Threats Against Abel Smith and Harold Jackson

¶ 107     The fourth claim is that the trial court erred when it allowed the State to present evidence that defendant verbally threatened to cut Abel Smith's and Harold Jackson's throats the morning of the crime. The admissibility of evidence, including other crimes evidence, is left to the trial court's discretion and will not be overturned absent a clear abuse of discretion. *Illgen*, 145 Ill. 2d at 364. As stated, "[a]n abuse of discretion occurs where the trial court's decision is arbitrary, fanciful or unreasonable [citation] or where no reasonable person would agree with the position adopted by the trial court." *Becker*, 239 Ill. 2d at 234.

¶ 108     Other crimes evidence is admissible if it is relevant to a proper issue, such as "motive, intent, identity, absence of mistake or accident, *modus operandi*, or the existence of a common plan or design." *People v. Norwood*, 362 Ill. App. 3d 1121, 1128-29 (2005) (citing *People v. Wilson*, 214 Ill. 2d 127, 135-36 (2005)). Evidence of other crimes is admissible to prove any material fact relevant to the case, but is inadmissible if only relevant to

demonstrate a defendant's propensity to engage in criminal activity. *Norwood*, 362 Ill. App. 3d at 1128 (citing *People v. Donoho*, 204 Ill. 2d 159, 170 (2003), and *People v. Hendricks*, 137 Ill. 2d 31, 52 (1990)). The trial court may exclude evidence of other crimes if its prejudicial effect substantially outweighs its probative value. *Illgen*, 145 Ill. 2d at 365. When the prior conduct is intrinsic to the matter being charged as a "continuing course of conduct," other crimes evidence may be admitted if it is relevant to establish a material issue, and the general principles of relevance apply. *People v. Manuel*, 294 Ill. App. 3d 113, 123-24 (1997). Generally, threats by a defendant against a third party are not admissible unless " ' "the connection between them and the deceased is such that under certain circumstances the threat would import harm to or hostility toward the deceased." ' " *People v. Szudy*, 262 Ill. App. 3d 695, 706 (1994) (quoting *People v. Williams*, 85 Ill. App. 3d 850, 856 (1980), quoting *People v. Scott*, 284 Ill. 465, 474-75 (1918) ("The general rule also is, that a threat by the accused to kill or injure a person other than the deceased, or a mere idle threat of a general nature not directed to any particular person, is not admissible to show malice towards the deceased.")). "The threat must in some way be linked to the victim." *Williams*, 85 Ill. App. 3d at 856 (citing *People v. Watkins*, 34 Ill. App. 3d 369, 374 (1975)).

¶ 109    In the case at bar, defendant's counsel argues that defendant's threats to Abel Smith and Harold Jackson were inadmissible because they were not directed toward Cavin and bore no connection to his death. At trial, Abel testified that defendant threatened to cut his throat the morning of the crime, and William Alston testified that defendant confronted Harold and similarly threatened to cut Harold's throat. Counsel argues that Cavin was not present during either incident, and that the State did not establish a connection between defendant's threats and a threat of harm to Cavin.

¶ 110    However, whereas evidence of other crimes may be admissible to show, among other things, motive, intent, identity, absence of mistake or accident, *modus operandi*, or the existence of a common plan or design (*Norwood*, 362 Ill. App. 3d at 1128 (citing *Wilson*, 214 Ill. 2d at 135-36)), relevant evidence merely tends to " 'make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *People v. Stewart*, 105 Ill. 2d 22, 54 (1984) (quoting Fed. R. Evid. 401). Here, defendant's threats to Abel and Harold constituted a continuing "course of conduct" that led up to Cavin's murder. *Manuel*, 294 Ill. App. 3d at 124.

¶ 111    The evidence at trial showed that defendant spent the night drinking alcohol and smoking crack cocaine, and then argued with and slapped his girlfriend when she asked Cavin to watch her house while she was in Iowa. Maurice heard defendant arguing with Cavin that night about Cavin leaving the house, and Abel asked defendant not to put his hands on his mother. Abel also observed defendant talking to himself and pacing in the kitchen, and defendant told Abel that Cavin had to leave and that he would not leave unless Cavin left first. Defendant became increasingly hostile and threatened to cut Abel's throat. Abel later heard defendant confront Cavin in the basement, and Cavin responded that if defendant hurt him, then defendant would only be hurting himself. Later that morning, Williams Alston also observed defendant's temper flare when he started breathing on Harold's food, to which Harold insisted that defendant back away. Defendant responded that he would cut Harold's throat, and Harold pushed him. Defendant then left the house in Maurice's vehicle and

-22-

returned 10 to 15 minutes later with a knife in his pocket. William and Harold quickly left to visit a nearby gas station, and when they returned a few minutes later, William observed defendant walking away from the house. Inside, William discovered a bloody shovel and Cavin dead in the basement.

¶ 112    These facts demonstrate defendant's increased agitation and escalating hostility, the focus of which was Cavin's refusal of defendant's demands to leave the house. The incident began when Sharon asked Cavin to watch the house. Defendant's anger or jealousy continued throughout the night as he argued with Cavin several times, demanding that he leave. Also, defendant became increasing more violent, as he first slapped Sharon, and then later threatened to cut the throats of her son and his friend. This course of events culminated in defendant beating Cavin to death with a shovel in the basement. As such, the trial court did not abuse its discretion when it allowed the testimony that defendant had threatened Abel and Harold the morning before the murder. *Illgen*, 145 Ill. 2d at 364.

¶ 113    Even if the testimony concerning defendant's threats should have been excluded, the trial court's error was harmless beyond a reasonable doubt. *Thurow*, 203 Ill. 2d at 272 (citing *Olano*, 507 U.S. at 734). The evidence at trial showed that defendant was with Cavin, and that defendant was observed approaching the home with a knife shortly before Cavin was discovered dead in the basement. Defendant's prints were discovered on the bloody shovel, and defendant's clothes contained bloodstains, which matched Cavin's DNA profile. There was overwhelming evidence to convict defendant beyond a reasonable doubt even in the absence of the testimony that he threatened Abel and Harold.

¶ 114                              V. Latent Fingerprint Analysis

¶ 115    The final claim is that the assistant public defender provided ineffective assistance of counsel when she did not request a *Frye* hearing concerning the admissibility of Illinois State Police print examiner Anastasia Petruncio's testimony that a palm print recovered from the bloody shovel found at the crime scene matched defendant's left palm print. *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923); *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 77 (2002). A defendant is denied effective assistance of counsel when: (1) his counsel's representation falls below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for his counsel's deficient performance, the result of the trial would have been different. *Strickland*, 466 U.S. at 688; *Albanese*, 104 Ill. 2d at 525.

¶ 116    The decision whether to file a pretrial motion is considered trial strategy, and trial counsel enjoys a strong presumption that the failure to file such a motion was proper. *People v. Spann*, 332 Ill. App. 3d 425, 432 (2002) (citing *People v. Rodriguez*, 312 Ill. App. 3d 920, 925 (2000)). To overcome that presumption, the defendant must demonstrate: (1) that the motion had a reasonable probability of success; and (2) that the outcome of the trial would have been different. *Spann*, 332 Ill. App. 3d at 432-33. A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome. *Spann*, 332 Ill. App. 3d at 437 (citing *Strickland*, 466 U.S. at 694). The question then, is not whether the defendant would more likely than not have received a different verdict absent the deficiency, but whether in light of the deficiency, he received a fair trial resulting in a verdict worthy of

confidence. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Since the facts surrounding trial counsel's performance are not in dispute and the claim was not raised in trial court, this court's review is *de novo* concerning assessment of the ultimate legal issue of whether counsel's omission supports an ineffective assistance claim. *People v. Berrier*, 362 Ill. App. 3d 1153, 1166-67 (2006) (citing *People v. Davis*, 353 Ill. App. 3d 790, 794 (2004)). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 117     Illinois follows the test outlined in *Frye*, commonly called the "general acceptance" test, which dictates that "scientific evidence is only admissible at trial if the methodology or scientific principle upon which the opinion is based is 'sufficiently established to have gained general acceptance in the particular field in which it belongs.' " *Central Illinois Public Service Co.*, 199 Ill. 2d at 77 (quoting *Frye*, 293 F. at 1014). "A court may determine the general acceptance of a scientific principle or methodology in either of two ways: (1) based on the results of a *Frye* hearing; or (2) by taking judicial notice of unequivocal and undisputed prior judicial decisions or technical writings on the subject." *People v. McKown*, 266 Ill. 2d 245, 254 (2007).

¶ 118     Defendant's appellate counsel argues that there is a long-standing debate in the scientific community concerning the validity of latent print identification. In support, counsel cites a 2009 National Research Council (NRC) report, which opined that latent fingerprint analysis, as well as other forensic identification methods, has not "been rigorously shown to have the capacity to consistently and accurately demonstrate a connection between evidence and a specific individual source." National Research Council of the National Academies, Strengthening Forensic Science in the United States: A Path Forward 137 (2009), at https://www.ncjrs.gov/pdffiles1/nij/grants/228091.pdf. Counsel also cites an unpublished Maryland trial court order, Maryland v. Rose, No. K06-0545 (Cir. Ct. Baltimore Co. Oct. 19, 2007), which excluded fingerprint analysis from evidence after the trial court conducted a *Frye* hearing.

¶ 119     However, over 100 years ago, our supreme court found that there is a scientific basis for fingerprint identification and that courts are justified in admitting this class of evidence. *People v. Jennings*, 252 Ill. 534, 549 (1911). Since then, federal and state appellate courts have uniformly rejected challenges to latent fingerprint analysis. *People v. Luna*, 2013 IL App (1st) 072253, ¶ 68. Though defendant's appellate counsel claims that the unpublished Maryland trial court order rejected the "general acceptance" of latent fingerprint analysis, we are unaware of the trial court's standing on that issue. After the prosecution withdrew the case in state court, the federal district court considered the issue on the same record and rejected the challenge to the fingerprint analysis. *United States v. Rose*, 672 F. Supp. 2d 723, 725 (D. Md. 2009). After the district court's finding in *Rose*, the Maryland appellate court noted that the defendant had provided only a "sole citation *** to a circuit court decision excluding fingerprint evidence," and it rejected the defendant's argument that latent print analysis was not a generally accepted methodology within the scientific community. *Markham v. State*, 984 A.2d 262, 274 n.7 (Md. Ct. Spec. App. 2009). Accordingly, there is no authority in Illinois, or in any other state, to support the claim that it is error for a circuit court to not hold a *Frye* hearing concerning the admissibility of latent fingerprint analysis.

*People v. Mitchell*, 2011 IL App (1st) 083143, ¶ 31.

¶ 120    Also, even if the assistant public defender erred in failing to request a *Frye* hearing, defendant did not suffer prejudice because there was still overwhelming evidence that he was guilty beyond a reasonable doubt. The evidence at trial showed that defendant was angry and acted aggressively toward Cavin, that defendant was observed leaving the house just prior to the discovery of the murder, and that the blood on defendant's clothing matched Cavin's DNA profile. Since defendant was not prejudiced by his counsel's failure to object to the latent fingerprint analysis, the assistant public defender did not provide ineffective assistance of counsel. *Strickland*, 466 U.S. at 690.

¶ 121                                                    CONCLUSION

¶ 122    For the foregoing reasons, we affirm defendant's conviction and sentence. First, the trial court did not err when it admitted defendant's bloodstained pants and boots into evidence because the State established a sufficient foundation through witness identification. Second, the assistant public defender did not provide ineffective assistance of counsel at trial for not introducing the hospital belongings list since the State was not required to prove a chain of custody. Third, the trial court did not err when it denied the defense's request to show a still shot from the Area 2 interrogation video because doing so would not impeach forensic investigator Rivera. Fourth, the trial court did not err in denying the defense's motion *in limine* to bar testimony that defendant threatened to cut Abel Smith's and Harold Jackson's throats the morning of the homicide because it established defendant's continuing course of conduct of anger and jealousy that culminated in Cavin's murder. And last, the assistant public defender was not ineffective for not objecting to the State's latent fingerprint analysis since such methods have been generally accepted in the scientific community for over 100 years. Also, we will not consider defendant's *pro se* supplemental motion because defendant is represented by counsel on appeal and has made no request to proceed *pro se*.

¶ 123    Affirmed.